**James M. BELL, Plaintiff,**

v.

**Elenora Giddings IVORY, Jane Hull Harvey, Anna Rhee, James E. (Jay) Lintner, Robert Tiller, Lionel Derenoncourt, Otis Turner, Vernon Broyles, Jerald L. Scott, and Interfaith Impact for Justice and Peace, Defendants.**

Civil Action No. 96–01084(SS).

United States District Court, District of Columbia.

June 11, 1997.

Tilman Lorenza Gerald, Hamilton, Gerald & Smith, Silver Spring, MD, James W. Crabtree, Smathers & Thompson, Charlotte, NC, for James M. Bell.

Alissa Aaronson Horvitz, Kathy Butler Houlihan, Morgan, Lewis & Bockius, L.L.P., Washington, DC, for Elenora Giddings Ivory, Jane Hull Harvey, Anna Rhee, James E. (Jay) Lintner, Robert Tiller, Lionel Derenoncourt, Otis Turner, Vernon Broyles, Interfaith Impact for Justice and Peace.

Mark Montgomery Jones, Jordan & Keys, Washington, DC, for Jerald L. Scott.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This matter is before the Court on Defendants' Motion for Summary Judgment[1] and Plaintiff's opposition thereto. The Court heard oral argument on May 29, 1997 and has considered all of the parties' submissions. For the reasons stated below, the Court will grant Defendants' motion for summary judgment in all respects.

## FACTUAL BACKGROUND[2]

The Defendant organization Interfaith Impact for Justice and Peace ("IIJP") was formed in 1990 for the purpose of advancing various public policy concerns. Plaintiff, an ordained minister of the United Church of Christ ("UCC"), was hired in 1991 as executive director of IIJP. Underlying this case is the circumstances surrounding Plaintiff's June 1995 termination from that position.

---

1. Defendants' Ivory, Harvey, Rhee, Lintner, Tiller, Derenoncourt, Turner, Broyles and Interfaith Impact for Justice and Peace have filed a joint motion for summary judgment. Since the motions hearing, Plaintiff has represented to the Court that he has reached a settlement agreement with Defendant Scott. Plaintiff states that he and Scott will be filing a stipulation of dismissal with prejudice this week.

2. As Plaintiff repeatedly states in his response to Defendants' motion for summary judgment, many facts are in dispute. The recitation of material facts in this opinion is undisputed, unless otherwise indicated.

*The Defendants*

The individually named defendants, with the exception of Jerald Scott, are members of the Board of Directors of IIJP ("IIJP Board"), each representing various religious denominations. Defendants Elenora Giddings Ivory, Lionel Derenoncourt and Vernon Broyles [3] represent the Presbyterian Church (U.S.A.). IIJP Board chair Jane Hull Harvey and Anna Rhee, represent the United Methodist Church. James Lintner represents Plaintiff's church, the UCC.

IIJP leases space in a building on Maryland Ave., NE, Washington, D.C. owned by the United Methodist Church. The building is managed through the Methodist Church's General Board of Church and Society ("Methodist General Board"). As well as being chair of the IIJP Board, defendant Harvey is Assistant General Secretary of the Methodist General Board. Former defendant Scott is an employee of the Methodist General Board.

*Hiring of Plaintiff*

The IIJP Board voted to hire Plaintiff as executive director in June 1991. Plaintiff began working in the position in August 1991. The terms of Plaintiff's employment were memorialized in a October 4, 1991 letter to Plaintiff, addressed from Defendant Ivory.[4]

In summary, the October 4 letter: (1) welcomed Plaintiff to IIJP; (2) recognized that the local chapter of the UCC would have the ability to review the terms of the agreement; (3) stated that the "terms of [Plaintiff's] employment [would] be governed by the [IIJP] Personnel Policy ... except where modified by this letter"; (4) detailed Plaintiff's salary

and social security offset; (5) stated that IIJP would make payments to Plaintiff's UCC pension plan, rather than covering Plaintiff under the IIJP plan; (6) noted that Plaintiff was receiving health coverage from UCC; (7) stated that the IIJP would cover Plaintiff's moving expenses; and (8) stated that benefits not addressed in the letter were to be as set forth in the IIJP Personnel Policy.[5]

*IIJP's financial collapse and subsequent RIF of employees*

Although there is dispute over who knew what, and when, it is clear that IIJP had various financial problems for most of its existence. These problems came to a head on May 8, 1995, when Ivory wrote a letter on behalf of the Presbyterian Church to IIJP Chair Harvey. In the letter, Ivory expressed her church's great concern at the financial status of IIJP. She informed Harvey that the Presbyterian Church would not provide any funding to IIJP in 1996 and would only complete its 1995 obligations if the IIJP Board took steps to lay off its staff, and pay off its debt. The Presbyterian Church was one of IIJP's major contributors. In a May 15, 1995 reply addressed to Ivory, Defendant Harvey expressed her disappointment at the Presbyterian's decision to withdraw financial support, claiming that in doing so, Presbyterian members of the Board had shown a total disregard for the Board's efforts to find a solution to IIJP's problems. She went on to state that by publishing the letter to others, the Presbyterians' had made it "very difficult to raise any new money."

On June 16, 1995, the IIJP Board held a meeting to discuss its options. Three possi-

---

3. Plaintiff claims that Defendant Broyles is not, and never was, a legal member of the IIJP Board. The Court need not resolve this dispute because it is not material to its decision in this case.

4. The purpose of this letter is a matter of dispute. While Defendants claim that the letter was written at Plaintiff's request because he needed to present the information to his church, the UCC. Plaintiff claims that the letter, along with other unwritten, negotiated terms, constitutes an employment contract. Plaintiff also claims that there are negotiated terms of his employment that are not written in the letter.

5. The letter included a signature line for the Plaintiff. Because the copies of the letter provided to the Court by the parties are not signed by Plaintiff, it is not clear whether Plaintiff ever formally accepted the terms of employment delineated by Ivory. Nevertheless, there is no indication that Plaintiff ever made any contemporaneous complaints about any of the terms set out in the letter. Furthermore, Plaintiff has submitted the letter as evidence of his employment agreement.

ble courses of action were presented: (1) keeping IIJP operating with a small paid staff, including Plaintiff; (2) terminating the paid staff and keeping the IIJP in operation with a volunteer staff; or (3) terminating all staff. In a straw ballot, 16 of 28 Board members voted for Option 2. The Board then voted 20 to 6 to accept the results of that straw ballot. Finally, the Board voted 21 to 1, with four abstentions, "to terminate Jim Bell, as executive director, and the remaining staff as [a] reduction in force as of June 16, 1995." Minutes of June 16, 1995 IIJP Board Meeting at 6.

In a June 23, 1995 letter to the Plaintiff, IIJP Personnel Committee chair James McDonald confirmed the June 16 RIF and provided details of Plaintiff's severance package, which included 60 days of salary, four weeks of severance pay, two-and-a-half weeks of vacation pay and some pension benefits.[6] In the letter, McDonald stated "it is my understanding that your contract is in agreement with [the severance provisions of the Personnel Policy manual]."

*Alleged removal of furniture from IIJP offices*

In July 1995, Defendant Harvey allegedly discovered that several pieces of furniture were missing from the IIJP offices. She raised the matter of the missing furniture at a Methodist General Board staff meeting, asking if anyone knew about the matter. Former Defendant Scott was at the meeting. She reported that on Saturday, June 24, 1995, shortly after Plaintiff's termination, she saw Plaintiff removing furniture from the IIJP offices, using the passenger elevators. Scott claims she spoke to Plaintiff at the time.[7]

On July 26, 1995, at Harvey's request, Scott prepared a memorandum describing the events of June 24. As she had at the meeting, Scott described seeing Plaintiff move furniture. She did not claim that he was moving IIJP furniture and certainly did not claim he was "stealing" anything. Scott did assert that the incident caught her attention because moving furniture in the passenger elevator is generally unauthorized under building rules.

Although Scott's memorandum was addressed "to whom it may concern," it was transmitted to Harvey. Harvey, in turn, transmitted the information to two people: her superior, Martha Cline, Associate General Secretary of the Methodist General Board[8] and Anne Spielberg, IIJP's attorney.

In the same June–August time period, Plaintiff was engaged in correspondence with IIJP, grieving his termination. In a series of letters, Spielberg and Plaintiff's counsel debated the merits of Plaintiff's claims against IIJP. Included in those letters were IIJP's allegations that Plaintiff had removed furniture that did not belong to him and Plaintiff's denial that he had done so. In an August 22, 1995 letter to Spielberg, Plaintiff's counsel stated that "[y]our continued accusations that [Plaintiff] is a thief are having a negative influence on any possibility of negotiations." Copies of this correspondence were apparently transmitted by one of the Defendants to all members of the Board.

After losing his position with IIJP, Plaintiff sought a position in his own church, the UCC. When Plaintiff told a representative of the UCC that he had been accused of "theft," he was advised not to circulate his resume within the UCC until the matter had been resolved. Plaintiff has now taken a position with a Chicago organization.

*Commencement of litigation*

On October 30, 1995, Plaintiff brought a diversity action in the United States District Court for the Eastern District of Virginia. As well as the IIJP board members named in this case, Plaintiff sued their churches direct-

---

6. The severance package was conditioned on Plaintiff signing a waiver of any claims against IIJP. Plaintiff refused to sign that waiver.

7. Plaintiff denies speaking to Scott. He further claims that the only furniture he ever removed from IIJP after his termination was his personal furniture.

8. Cline was property manager for the building. Accordingly, Cline had a two-prong relationship with Harvey. First, they had a supervisor-supervisee relationship in the Methodist General Board hierarchy. Second, they had a landlord-tenant relationship with regard to IIJP's leasing of space from the Methodist Church.

ly. Neither IIJP nor Scott were defendants. On January 19, 1996, the Virginia court dismissed the case against the churches with prejudice, on First Amendment grounds. The court also dismissed the case against the individual defendants without prejudice on jurisdictional and venue grounds.

Plaintiff refiled his action in this Court on May 10, 1996. He was granted leave to amend his complaint on December 23, 1996, at which time he added Scott as a defendant. In his seven-count amended complaint, Plaintiff makes the following District of Columbia tort and contract claims [9]:

Count I—Intentional Interference with Contract;

Count II—Breach of Contract;

Count III—Breach of Covenant of Good Faith and Fair Dealing;

Count IV—Interference of Prospective Advantage;

Count V—Wrongful Termination;

Count VI—Intentional Infliction of Emotional Distress; and

Count VII—Defamation

Following the close of discovery, the Defendants moved for summary judgment on all counts.

### SUMMARY JUDGMENT STANDARDS

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Mere allegations or denials of the adverse party's pleadings are not enough to prevent issuance of summary judgment. The adverse party's response to the summary judgment motion must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. Pro. 56(e).

The Supreme Court set forth the governing standards for issuance of summary judgment in *Celotex Corp. v. Catrett*, 477 U.S.

317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In *Celotex*, the Supreme Court recognized the vital need for summary judgment motions to the fair and efficient functioning of the justice system:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed. Rule Civ. P. 1. . . .

> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Id.* at 327, 106 S.Ct. at 2555 (citation omitted).

The moving party is entitled to summary judgment where "the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex* at 323, 106 S.Ct. at 2552. Any factual assertions contained in affidavits and other evidence in support of the moving party's motion for summary judgment shall be accepted as true unless the facts are controverted by the non-moving party through affidavits or other documentary evidence. See Local Rule 108(h).

In resolving the summary judgment motion, all reasonable inferences that may be drawn from the facts placed before the Court must be drawn in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). The inferences, however, must be reasonable, and the non-moving party can only defeat a motion for summary judgment by responding with some factual showing to create a genuine issue of material fact. *Harding v. Gray*, 9 F.3d 150, 154

---

**9.** Former Defendant Scott was only sued in Count VII, Defamation. Defendant IIJP is not sued in Count I, Intentional Interference with Contract.

(D.C.Cir.1993). The non-movant has met its burden of showing that a dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C.Cir.1987) (*per curiam*) (citing *Anderson, supra*).

### ANALYSIS & DECISION

#### Counts I–III: The Contract claims

Counts I–III of Plaintiff's complaint rely on the existence of an employment contract between Plaintiff and Defendant IIJP either for a fixed term or only terminable for cause. Defendants deny the existence of any such contract, claiming that Plaintiff was employed "at will."

Under the law of the District of Columbia, the mutual promise to employ and serve creates a contract terminable "at will" by either party. *Sullivan v. Heritage Foundation*, 399 A.2d 856 (D.C.1979). The presumption of "at will" employment can be overcome by the creation of a contract of employment for a fixed term or an indefinite contract that allows termination only for cause. *Hodge v. Evans Financial Corp.*, 707 F.2d 1566 (D.C.Cir.1983). Accordingly, the question in this case is whether the various discussions between the parties, the related documentation and the statements of certain employees and directors, overcome the "at-will" presumption.

It is undisputed that there was no explicit contract between the parties. Plaintiff and the IIJP did not sign a single document, incorporating all the terms of employment. Neither has Plaintiff produced any document or other evidence showing a specific agreement between Plaintiff and IIJP on the length of his term of employment.

It is also undisputed that generally, IIJP employed its paid staff on an "at-will" basis, pursuant to the terms and conditions of employment found in the IIJP Personnel Policies. Those policies provide for resignation, termination for cause and RIF of any IIJP employee.[10]

Plaintiff claims, however, that his employment with IIJP was not governed by the Policies, with the exception of two matters: (1) involuntary termination of the executive director for cause, and (2) vacation and sick leave. In an effort to demonstrate this, Plaintiff points to the various unusual elements of his employment with IIJP which differed from terms offered to lower-level employees.[11]

The Court has considered all of this evidence. While the Plaintiff has provided evidence that the parties negotiated certain terms that differed from the Personnel Policies, the record does not support a finding that where the negotiations were silent as to a particular issue, the Policies would not

---

10. Section XIV of the Personnel Policies describes the three bases for termination. Some of the language refers explicitly to the executive director. The Resignation policy allows the Executive Director to resign after giving 60 days notice, or otherwise by agreement. The "Involuntary Termination" policy provides for termination of the Executive Director for cause by the Board of Directors on the recommendation of the Executive Committee. The RIF policy refers generally to employees of the organization and provides for their severance package. The only reference to the Executive Director in the RIF section is to state the Executive Director's role in administering the RIF. Plaintiff claims that the reference to the Executive Director *administering* the RIF infers that the Executive Director cannot be *subject* to the RIF. The Court finds no basis in the evidence to reach this conclusion.

11. The factors Plaintiff list include: (1) his several months of negotiations on the terms of his employment with IIJP, including such matters as his financial package, a Social Security offset, pension benefits and the hiring of other staff; (2) his intent to enter into a year-to-year contract; (3) that unlike other employees, he was not subject to a 90-day review, annual review or probation; (4) that unlike other employees, his federal, state and social security taxes were not subject to employer withholding; (5) that unlike other employees, he did not participate in the IIJP's health plan and instead received coverage from the UCC's program; (6) that unlike other employees, Plaintiff was not restricted to the standard terms of the pension plan; (7) that certain of IIJP's officers and employees have made various statements referring to their employment relationship with the Plaintiff as a "contract"; and (8) that two of IIJP's directors have stated in declarations that they believed at the time they voted to hire Plaintiff, he was to have a fixed-term contract and not be subject to a RIF.

apply. Indeed, in her October 4, 1991 letter to Plaintiff, Defendant Ivory stated that

> the terms of your employment will be governed by the Personnel Policies adopted by the Board of Directors at their December, 1990 meeting including any subsequent amendments, except where modified by this letter.

*Letter from Elenora Ivory to Rev. Jim Bell,* October 4, 1991 at 1. The letter then goes on to explicitly state those terms of employment that are either unstated in the Policies (e.g., salary) or differed from the Policies (e.g., the pension plan). Neither the October 4, 1991 letter or the Policies state that Plaintiff is to be employed for a fixed term or that his employment is only terminable for cause. Neither does the letter declare any intent on the part of IIJP and its directors to exempt Plaintiff from the RIF provision.

Addressing some of the points raised by Plaintiff explicitly:

■ (1) The Court does not find any consequence in the fact that two Board members have declared that they believed a contract existed. For a contract to exist, *both* parties must intend for it to exist. The parties here are the Plaintiff and the IIJP, as represented by the Board of Directors as a whole. The fact that two members of the Board had a different understanding of the terms of Plaintiff's employment is not dispositive. The only evidence that would be material on this point is evidence that a majority of the Board, when it hired Plaintiff, intended that he be hired under a contract and

exempt from the RIF policy. That evidence has not been presented by Plaintiff.[12]

■ (2) Plaintiff also represents that the annual revisiting of the terms of his employment evidences a fixed-term contract. Common sense dictates that this is not a reasonable conclusion. In many employment situations, at-will employees receive employment reviews, either in a structured or informal manner. The fact that the terms of Plaintiff's employment were reviewed annually does not mean that he had a year-to-year contract.

■ (3) Plaintiff asserts that because he negotiated special terms of employment, differing from the standard terms of employment provided by IIJP, he had a contract. The Court does not agree with this analysis. The parties could have negotiated any number of terms of employment, all of which differed from the Policies that applied to other employees. As long as none of those terms of employment explicitly stated or implied that Plaintiff was to be employed for a fixed term or only subject to termination to cause, they would not rebut the presumption that the Plaintiff was terminable at-will.[13]

■ Accordingly, after viewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff has not presented evidence that rebuts the presumption that he was subject to termination "at will."[14] As an "at-will" employee, he cannot succeed in Counts I–III, on his claim that his termination constituted Intentional Interference with Contract,[15] Breach of Contract, or Breach of Covenant of Good Faith and Fair Dealing.[16]

12. Furthermore, the fact that some IIJP employees referred to the agreement in various documents as a "contract" does not evidence the intent of the organization. The fact that a layperson uses the word "contract" to describe the agreement between the parties cannot, by itself, show that the parties had a contract, as a matter of law, for a fixed or indefinite term.

13. The Court is hard-pressed to understand why an employee could not negotiate specific terms of his employment. Just because an employee can be terminated "at will" does not mean that he cannot demand a better salary, benefits, hours, etc. while he is employed.

14. Even assuming, *arguendo,* that there was a contract, there is no basis to find that the con-

tract was breached. It is Plaintiff's own statement that the parties had a "year-to-year" contract. The terms of the severance package paid Plaintiff's salary and benefits for the remainder of that year.

15. *Sorrells v. Garfinckel's,* 565 A.2d 285, 289 (D.C.1989); *Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan,* 374 A.2d 284, 288 (D.C. 1977) (to recover for intentional interference with contractual relations, there must be a contract).

16. *See Minihan v. American Pharmaceutical Ass'n,* 812 F.2d 726, 729 n. 2 (D.C.Cir.1987) (no authority for breach of covenant of good faith and fair dealing action in District of Columbia where there is no contract).

*Count IV: Interference with Prospective Advantage*

 In Count IV, Plaintiff claims Interference with Prospective Advantage. The "interference" claimed by Plaintiff is twofold: first, that defendants interfered with his ability to raise funds for IIJP; and second, that the defendants accused him with theft, which prevented him from receiving employment with the UCC. Viewing the facts in the light most favorable to Plaintiff, the Court concludes that neither claim can survive summary judgment.

 In order to establish a claim for tortious interference with prospective economic advantage, the evidence must show

 (1) the existence of a valid business relationship or expectancy;
 (2) knowledge of the relationship or expectancy on the part of the interferer;
 (3) intentional interference inducing or causing a breach of termination of the relationship or expectancy; and
 (4) resultant damage.

*Bennett Enterprises v. Domino's Pizza*, 45 F.3d 493, 499 (D.C.Cir.1995). " '[A] general intent to interfere or knowledge that conduct will injure the plaintiff's business dealings is insufficient to impose liability.' Plaintiff cannot establish liability without a 'strong showing of intent' to disrupt ongoing business relationships." *Id.* (internal citations omitted).

Plaintiff's claim that Defendants interfered with his prospective advantage by preventing him from fundraising for the organization has no basis. Except in the general sense that he was an employee of IIJP, Plaintiff could have no genuine expectancy that he would personally benefit from IIJP's ability to raise funds. Any funds he raised would accrue to the benefit of IIJP.

Furthermore, to prove the "intent" prong of the tort, Plaintiff would essentially have to show that the Board or some of its members intentionally undermined the organization in order to interfere with Plaintiff's fundraising efforts. This is certainly not supported by the evidence. At the very most, the facts might support a conclusion that one defendant—Ivory—wrote a letter that adversely affected IIJP's ability to fundraise. Even if that was deliberate, the victim was IIJP, not Plaintiff.

 Plaintiff's second claim is that allegations of theft prevented him from obtaining a position with UCC, because the UCC representative advised him not to circulate his resume. Again, the evidence does not support Plaintiff's claim against Defendants. The undisputed evidence shows that it was *Plaintiff* who conveyed the allegations of theft to the UCC representative.[17] There is no evidence that Defendants made the allegations public outside of IIJP. Furthermore, there is no evidence that the allegations were made with the intent of preventing Plaintiff from obtaining a position with UCC. Accordingly, both of Plaintiff's claims under Count IV fail.

*Count V—Wrongful Termination*

 In Count V, Plaintiff claims wrongful termination. The District of Columbia does not generally recognize a claim of wrongful termination made by an at-will employee. The only exception is in the case of discharge based on an employee's refusal to violate the law. *Smith v. Union Labor Life Insurance Company*, 620 A.2d 265, 269 (D.C.1993). There is no evidence that Plaintiff's termination falls into this very narrow exception. Accordingly, Plaintiff's claim of wrongful termination fails.

*Count VI—Intentional Infliction of Emotional Distress*

 In Count VI, Plaintiff alleges Intentional Infliction of Emotional Distress. To support such a claim, Plaintiff must show "extreme and outrageous conduct intentionally or recklessly [causing] severe emotional distress to another." *Id.* at 269–70 (internal citations omitted).

Defendants' actions against Plaintiff in this case have substantially been that: (1) in a

---

17. It should be noted that in all the correspondence viewed by the Court, it is Plaintiff who makes liberal use of the words "stolen" and "thief." Although Defendants have alleged that Plaintiff removed IIJP furniture, they have never put it in "criminal" terms.

time of great financial distress, they laid him off, along with every other member of IIJP's paid staff; and (2) they alleged (without publishing their allegations to the outside world) that he removed furniture belonging to IIJP.[18]

Viewing the evidence in the light most favorable to Plaintiff, he does not make out a case that the conduct on the part of Defendants was "extreme and outrageous." Neither is there evidence that Defendants took any action against Plaintiff with tortious intent or recklessness. And while the Court does not question that plaintiff suffered emotionally from the loss his job, there is no evidence that suffering rose to the level of "extreme emotional distress."

*Count VII—Defamation*

In Count VII, Plaintiff alleges that he was subjected to defamation. Underlying this claim is the alleged incident involving the removal of furniture from IIJP offices. Plaintiff claims that Harvey's statements to Cline and Spielberg that Plaintiff had removed the furniture amounted to a false allegation of theft, and was defamatory. He also claims that the Defendants defamed him by allowing letters between Spielberg and Plaintiff's counsel relating to the furniture allegations to circulate to members of the Board.

Defendants claim that the Court should grant them summary judgment on this count for any of three reasons: the statements made regarding Plaintiff were (1) not defamatory; (2) not made negligently; and (3) privileged in nature. The Court does not reach the first two prongs, because it agrees with Defendants that the statements were privileged in nature.

■ A statement is privileged if it is "(1) made in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which [she] has, or honestly believes [she] has, a duty to a person having a corresponding interest or duty, (3) to a

person who has such a corresponding interest." *Moss v. Stockard,* 580 A.2d 1011, 1024 (D.C.1990).

■ Addressing defendant Harvey first, the evidence presented by defendants is that Harvey (1) noticed that IIJP furniture was missing; and (2) received information from Scott that Plaintiff was seen removing furniture, including some of the furniture that was missing. She passed this information on to Cline—her supervisor and representative of IIJP's landlord—and to Spielberg, IIJP's attorney.

As an initial matter, there is no evidence presented by Plaintiff that indicates that the information was passed on by Harvey in bad faith. Furthermore, no evidence presented by Plaintiff counters Defendants' claim that Harvey had an interest in the information and a duty to pass it on. The information directly related to removal of furniture in violation of the building's rules. Harvey had a duty to pass the information on to Cline, who was her superior on the Methodist General Board and property manager for the building. Based on her good faith belief that a former employee of IIJP had violated building rules and had removed furniture belonging to IIJP, Harvey also had a direct "interest" as chair of the IIJP Board.

The third prong is met for the corresponding reason: both recipients of the information had an interest in it. Cline had an interest in the allegedly unauthorized removal of property from a building she managed, by a former employee of one of her tenants. Spielberg had an interest because she was representing IIJP in response to Plaintiff's threatened lawsuit.[19] Therefore, Harvey's statements were protected by a privilege and cannot be subject to a defamation action.

■ The Plaintiff also claims that the Defendants slandered him by circulating his correspondence with Spielberg to members of the Board. Plaintiff claims that the infor-

---

18. Plaintiff does allege that at one point, Defendant Lintner made some inappropriate comments to him. Based on the evidence presented, this appears to have been a single incident with no connection to Plaintiff's eventual termination.

19. Of course, Spielberg and IIJP had an attorney-client relationship. Accordingly, any information passed on to Spielberg by Harvey in her role as chair of IIJP's Board of Directors would likely be subject to the attorney-client privilege.

mation was not privileged as to all Board members because he was not threatening litigation as to all board members. The Court is not convinced by this line of reasoning. Plaintiff's claim that he was wrongfully terminated raised, at the very least, the prospect of litigation against IIJP. Every member of the Board had an interest in the potential for litigation against the organization. Accordingly, good faith circulation of memoranda relating to that litigation to members of the Board is privileged and generally cannot be the basis for a defamation claim.

## CONCLUSION

Regardless of how many declarations, depositions and documents Plaintiff provides to this Court, his claims cannot be sustained because the evidence found in them does not support the allegations in his complaint. It is true, as Plaintiff states, that there are certain facts in dispute. But even under Plaintiff's version of the facts, the picture is clear. In 1995, IIJP was an organization in great financial despair. Plaintiff's loss of employment was incidental to the virtual collapse of IIJP. He was an at-will employee who—along with a lot of other people—lost his job when IIJP was forced to downsize. While this may be unfortunate, it cannot justify this protracted litigation. Plaintiff wants this Court to write a contract that would provide Plaintiff with "tenure" that would even survive a RIF dictated by a severe financial reversal of fortune. This the Court cannot and will not do.

Accordingly, for the reasons stated above, the Court will grant Defendants' motion for summary judgment in all respects, and dismiss this case.