**Deborah MANDSAGER, Appellant,**

v.

**Wayne T. JAQUITH and Public Education Center, Inc., Appellees.**

**No. 96–CV–1598.**

District of Columbia Court of Appeals.

Argued Jan. 7, 1998.

Decided Feb. 19, 1998.

John A. Taylor, Washington, DC, for appellant.

Jonathon H. Pittman, with whom Clifton S. Elgarten was on the brief, Washington, DC, for appellees.

Before FARRELL and KING, Associate Judges, and BELSON, Senior Judge.

KING, Associate Judge:

Deborah Mandsager, an at-will employee claiming she had been fired from her job because she refused to violate certain laws, filed a wrongful discharge action against her employer Public Education Center, Inc. ("PECI") and PECI's president, Wayne T. Jaquith. *See Adams v. George W. Cochran & Co.*, 597 A.2d 28 (D.C.1991) (recognizing a narrow exception to the at-will doctrine allowing a terminated employee to recover for a wrongful discharge when the sole reason for the discharge was the employee's refusal to violate the law). The trial court granted Jaquith's motion to dismiss the complaint as it applied to him individually on the ground that the action could be maintained, if at all, only against the employer and not against Jaquith personally. Subsequently, the trial court also granted the employer's motion for

summary judgment, ruling that the employer had not put Mandsager to the choice of either violating the law or being fired if she refused to do so. *See Thigpen v. Greenpeace, Inc.*, 657 A.2d 770, 771 (D.C.1995) (this exception to the at-will doctrine requires "an outright refusal to violate a specific law, with the employer putting the employee to the choice of breaking the law or losing [her] job"). In this appeal the employee contends that the trial court erred both in dismissing the complaint as to Jaquith and in ruling that the complaint did not make out a case under the *Adams* exception. We need not decide the first question because we are satisfied the trial court correctly concluded that the employee failed to establish entitlement to relief pursuant to the *Adams* exception.[1] Accordingly, we affirm.

## I.

The facts presented to the trial court, which came in the form of an affidavit and deposition of Mandsager, the deposition of Jaquith, and affidavits submitted by several employees of PECI,[2] were essentially undisputed. They showed that PECI was a nonprofit organization in the District of Columbia which operates news services, reporting on matter relating to environmental and national security issues. Jaquith was PECI's president. PECI employed a bureau chief, several reporters and a small support staff. Most of its funding came from foundation grants; however, a small amount was received from a few individual donors.

Mandsager was hired as an at-will employee in June 1995. Her duties were essentially clerical, requiring her to assist Jaquith in performing his duties. In his deposition, Jaquith testified that Mandsager failed to complete her assignments, made material mistakes in her work and began to take on tasks and projects that had not been assigned to her. Jaquith also testified that on November 7 he decided to fire Mandsager and on that date he began taking steps to find a replacement. Those efforts were not immediately successful and Mandsager was still employed on November 16, 1995, the date she was terminated.

The events that Mandsager claims led to her firing began in mid-October when she was assigned the task of assembling and mailing the "end-of-the-year" solicitation seeking contributions from individuals. Mandsager's duties included updating the database of the mailing list, ascertaining the disclosures that the various states required to be included in the solicitations, and the preparing of envelopes. Because PECI had not completed the process of registering as a charitable organization in all of the states to which it expected to send mailings, Mandsager was also assigned the task of collecting the necessary information and completing the forms required by the states to be filed.

Mandsager testified on deposition that she learned, for the first time on November 14, 1995, that PECI was not registered in either Maryland or Virginia, two states to which solicitations were to be sent. She brought those facts to Jaquith's attention and she claimed he became upset with her when she

1. In *Carl v. Children's Hosp.*, 702 A.2d 159 (D.C. 1997) (en banc) the *en banc* court held that there may be additional public policy exceptions to the at-will doctrine beyond that recognized in *Adams*. In the controlling opinion, however, a majority of the *en banc* court defined the scope of any new exceptions narrowly. *Id.* at 162–64 (Part I(B) of the opinion by Terry, J., joined by three judges) (footnote omitted); *id.* at 197 n. 2 (dissenting opinion by Steadman, J., joined by one judge, acquiescing in the standard set out by J. Terry in the controlling opinion). Although it is still an open question whether the standard set forth in *Carl* would apply retroactively to firings, such as this one, that occurred before *Carl* was decided, *see Washington v. Guest Servs. Inc.*, 703 A.2d 646 (D.C. 1997), counsel for Mandsager conceded at oral argument that even if *Carl* were retroactively applicable to this case, it would have no bearing on the outcome. We agree.

2. The affidavits of the employees were submitted mainly to establish that Jaquith had decided to fire Mandsager, for poor performance, over a week before the issue of so-called illegal conduct arose. Because an *Adams* cause of action would lie only if Mandsager was fired *solely* because she refused to break the law, these affidavits were submitted to show that there were other reasons for the firing and therefore the discharge could not have been *solely* due to the alleged refusal to violate the law. Because we reject the employee's claim on other grounds, we do not reach the question whether the affidavits were sufficient for that purpose.

informed him that she had spoken to officials in each state concerning PECI's failure to register.[3] Mandsager averred that she herself then became upset and informed Jaquith that she wished to discuss the matter the next day. Mandsager maintains that "her actions and demeanor were such that any reasonable person in [Jaquith's] position would have interpreted her words and actions as a refusal to send the mailing and would have concluded that she did not intend to proceed with the mailing as instructed by her employer."

Mandsager called in sick the next day, but on November 16th she arrived at work before Jaquith and learned that he had called in with instructions which she later described in two different ways. In her deposition, given on August 21, 1996, she testified that the message from Jaquith instructed her "to continue putting together disclosure statements and continue prepping the mailing." In her affidavit in opposition to summary judgment which was sworn to on September 23, 1996, she averred that Jaquith's instruction was that she should "proceed with the mailing." Mandsager then drafted a memorandum captioned "End of year mailing" for Jaquith, in which she discussed, among other points, possible solutions to the problems posed by PECI's failure to register. Specifically, Mandsager pointed out that registration might not be necessary for those states where donations were minimal. She also recommended in her memorandum that there be no mailings to states where PECI had not registered and where it might have sufficient donors to trigger the registration requirement. She agreed in her deposition, however, that if the registrations were filed before the mailings were sent there would be no violation.

Later that day, Mandsager and Jaquith met to discuss the contents of the memo.

Mandsager suggested several ways the mailing could be accomplished without violating the law such as determining whether there were exceptions to the registration requirement, or by ensuring the necessary registration papers were filed before any mailing. Mandsager admits that at no time was she instructed, during that meeting, to send out a mailing that violated any state law. She also acknowledged that she never refused to make the mailing. Mandsager and Jaquith then began discussing Mandsager's performance in general, including her failure to obtain the necessary registrations,[4] but without any further reference to the mailing. At the conclusion of that discussion, Jaquith informed her that she should either resign or be fired. She chose the latter. This action followed.

## II.

At the time Mandsager was discharged, the long-standing rule in the District of Columbia, other than as set forth in *Adams,* was that "an employer may discharge an at-will employee at any time and for any reason, or for no reason at all." *Thigpen, supra,* 657 A.2d at 771. In *Adams* we recognized a narrow exception which allowed a fired employee to sue "for wrongful discharge when the sole reason for the discharge is the employee's refusal to violate the law, as expressed in a statute or municipal regulation." *Adams, supra,* 597 A.2d at 34.[5]

Mandsager argues that she falls within the *Adams* exception because of the following sequence of events. In October she was instructed to begin preparation of the solicitation for mailing some time in late November; on November 14 she learned that PECI was not registered in Maryland and Virginia and that mailings to potential donors in those

---

**3.** Jaquith agreed that he expressed disapproval of Mandsager's having called the state officials because the information she was seeking was available in PECI's files.

**4.** In particular, according to Mandsager's deposition, Jaquith "blamed the lack of registration on [her] saying that it was [her] job description to have registered in all these states."

**5.** In the lead and controlling opinion in *Carl v. Children's Hosp.,* 702 A.2d 159 (D.C.1997) (en banc), Judge Terry quotes the foregoing language of *Adams. Id.* at 162. The opinion does not deal with the "sole reasoning" requirement of *Adams. Cf. Wallace v. Skadden, Arps, Slate, Meagher & Flom,* Nos. 96–CV–34 & 96 CV–739, slip op. at 26 n. 25, —— A.2d ——, —— n. 25 (D.C. January 15, 1998).

states would violate the law;[6] later the same day she communicated that fact to Jaquith who then was on notice that mailings to those states would be unlawful; Jaquith communicated a message on November 16 instructing Mandsager to "proceed with the mailing" (although as noted above, in her deposition Mandsager testified that Jaquith's instructions were to continue "prepping" the mailing); and Jaquith did not rescind that instruction during their later conversation which culminated in her being fired. Thus, she argues, it is reasonable to infer from this sequence of events that, in the language of *Adams*, "the sole reason for the discharge [was] the employee's refusal to violate the law." *Id.* That contention does not square with our interpretation of the operative language in *Adams* and is belied by Mandsager's own testimony.

In *Thigpen* we held that before an employee may obtain relief under this exception to the at-will doctrine, it must be shown that there was "an outright refusal to violate a specific law, with the employer putting the employee to the choice of breaking the law or losing [her] job." *Thigpen, supra,* 657 A.2d at 771. Clearly, those requirements were not met in the circumstances presented here.

For example, we also held in *Thigpen* that a "constructive refusal to violate the law" is not sufficient; there must be an express refusal to do the act that violates the law. *Id.; see Adams, supra* (employee fired after refusing the employer's express instruction to drive an uninspected vehicle when doing so would be in violation of the law). Similarly, contrary to what Mandsager argues here, it is not enough to show that the employee might infer from the employer's conduct that she was being asked to do something that

was possibly illegal. In this case, Mandsager knew, because she had researched the point as reflected in her memo, that there were ways to conduct the mailing legally, such as by completing the registration requirement first. In light of that, even an express direction to mail the solicitation, without more, would not constitute an order to do an act that was necessarily illegal. Furthermore, as Mandsager conceded in her deposition, she never told Jaquith that she would not conduct the mailing. It is not entirely clear why there was no explicit refusal; however, it is fair to assume on these facts that there was no occasion to refuse to conduct an illegal mailing, because no express instruction to make such a mailing was given.

In sum, there was no express direction given to the employee to do an act that would violate the law and there was never an outright refusal, on the employee's part, to conduct the mailing, an act which may, or may not, have been illegal. We agree with the trial court that Mandsager was never "put to the 'Hobson' choice of either doing an illegal act, *i.e.,* putting the solicitations in the mail stream without proper registration first having been achieved, or being fired if she did not elect the former course." Therefore she is not entitled to relief.

For these reasons the judgment is

*Affirmed.*

---

6.  None of the statutory provisions relating to the registration requirements are included in the record; therefore, we do not know precisely what conduct is prohibited. The parties, and the trial court, apparently assumed that by placing solicitations in the mail to addressees in states where PECI was not registered would result in criminal liability on the part of the sender including clerical personnel, such as Mandsager, who actually deposited the material in the mail. For our purposes here, we will make the same assumption.