Frank RIGGS, Plaintiff,

v.

HOME BUILDERS INSTITUTE,
et al., Defendants.

No. 01CV0412.

United States District Court,
District of Columbia.

March 18, 2002.

Debra Susan Katz, David J. Marshall, Bernabei & Katz, Washington, DC, for Frank Riggs, plaintiff.

Paul J. Kennedy, Littler Mendelson, P.C., Washington, DC, Erica K. Smith, Peter Robert Spanos, Littler Mendelson, Atlanta, GA 30326, for Home Builders Institute, defendant.

Stephen R. Smith, Powell, Goldstein, Frazer & Murphy, Washington, DC, for National Association of Home Builders, defendant.

## MEMORANDUM OPINION

THOMAS F. HOGAN, Chief Judge.

Plaintiff Frank Riggs has sued his former employer, Home Builders Institute ("HBI"), its affiliate, the National Association of Home Builders ("NAHB"), and two NAHB officers, Thomas Downs and Robert Mitchell, for wrongful termination, tortious interference with contract and prospective advantage, and civil conspiracy. Defendants HBI, NAHB, Downs, and Mitchell have moved to dismiss the complaint for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6). Upon careful consideration of the defendants' motions to dismiss, the oppositions and replies thereto, and the entire record herein, the Court will deny HBI's motion and will grant in part and deny in part NAHB's motion.

## I. BACKGROUND[1]

From 1991 to 1993 and from 1995 to 1999, Plaintiff Frank Riggs served as a U.S. Representative in Congress from Cal-

---

1. Because this matter is before the Court on motions to dismiss, the Court will construe the complaint liberally, taking all the facts alleged as true, and giving the plaintiff the

ifornia's 1st District. In the 105th Congress, he served as Chairman of the U.S. House Subcommittee on Early Childhood, Youth and Families and authored legislation concerning special education, job training, vocation and technical education, charter schools, and other youth-related issues. After leaving Congress in 1999, he worked briefly with the Heritage Foundation as a Visiting Fellow in Education Studies. Compl. ¶ 3.

Defendant NAHB is a national trade association of home-building contractors with 210,000 members who are organized into local and state home builders associations. *Id.* ¶ 5. Defendant Thomas Downs is NAHB's Executive Vice President and Chief Executive Officer. *Id.* ¶ 6. Defendant Robert Mitchell is NAHB's President. *Id.* ¶ 7. Defendant HBI is a non-profit organization that serves as the educational and training arm of NAHB and is structured as a nonprofit public benefit school, exempt from taxation under section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3). HBI's mandate is to enhance the professionalism of NAHB members through continuing education and to train and place skilled workers into productive industry careers through contracts with the federal government and the private sector. *Id.* ¶ 4.

In late 1999, HBI and NAHB agreed to expand HBI's mission to champion the homebuilding industry among a new generation of youth. In September 1999, HBI acquired a $1 million grant from the U.S. Department of Labor ("DOL") as part of a school-to-work initiative to introduce thousands of students to the skills and occupations in the home construction industry.

*Id.* ¶¶ 8–9. HBI and NAHB also formed a search committee to recruit a new president for HBI to lead its expanded educational mission. *Id.* ¶ 10.

After interviewing Riggs, HBI hired him as its President and Chief Executive Officer ("CEO") on December 6, 1999 to spearhead its education mission. *Id.* ¶¶ 10–13. Under a job description provided to Riggs, he would report to Thomas Woods, the Chairman of HBI's Board of Trustees. The job description emphasized HBI's independence from NAHB. *Id.* ¶ 10. But NAHB officers, including Downs and Mitchell, nonetheless expected Riggs to play a political role on behalf of NAHB and to use his influence as a former Congressman and national leader of the Republican Party to advance NAHB's efforts to influence political campaigns and legislation. *Id.* ¶ 15.

In January 2000, Downs asked Riggs to attend political receptions in his capacity as President and CEO of HBI for former Congressman Newt Gingrich and Congressman Rick Lazio at NAHB's International Builders Show. Riggs attended, but felt "uncomfortable with Downs'[s] request that he play a political role on NAHB's behalf—particularly with Mr. Lazio, who, as Chairman of the House of Representatives Housing Subcommittee at the time, was an influential member of the U.S. House of Representatives on issues of importance to NAHB." *Id.* Downs subsequently asked Riggs to attend the Republican National Convention in August 2000. Downs also emphasized to Riggs at the time that NAHB had established a $1 million "soft money" fund to distribute to the presidential campaigns through national

benefit of all reasonable inferences from those facts. *Maljack Prods., Inc. v. Motion Picture Ass'n of Am., Inc.*, 52 F.3d 373, 375 (D.C.Cir. 1995); *Henthorn v. Dep't of Navy*, 29 F.3d 682, 684 (D.C.Cir.1994); *Kowal v. MCI Com-*

*munications Corp.*, 16 F.3d 1271, 1276 (D.C.Cir.1994). This background is set forth accordingly and does not constitute findings of fact.

party committees or independent efforts such as "Builders for Bush." Riggs declined to attend the convention, stating to Downs that HBI's status as a tax-exempt educational organization prohibited him from participating in partisan political campaigns. *Id.* ¶ 16. Downs also urged Riggs to participate in NAHB's weekly Senior Executive Council meetings, at which NAHB's political and legislative agenda was routinely discussed. *Id.* ¶ 17. Mitchell invited Riggs to attend NAHB's Strategic Implementation Meeting held February 18–20, 2000 in Palm Harbor, Florida. Riggs attended the Meeting, but excused himself from a half-day session entitled "Legislative Agenda/National Election Year," fearing that the session would focus on NAHB plans to influence legislation and political campaigns. Official minutes from the session reflect that NAHB members discussed a proposed resolution to support a presidential candidate in the 2000 election, the formation of political action and fund-raising groups, and a range of legislative initiatives concerning Brownfields, international lumber, and Social Security. *Id.* ¶ 18.

NAHB's leadership reacted angrily to Riggs's refusal to involve himself in political and legislative activities that he believed would violate section 501(c)(3) of the Internal Revenue Code and various DOL regulations, including 20 C.F.R. § 638.814(a) and (b), and his insistence upon HBI's legal autonomy from NAHB. Compl. ¶¶ 19–23. NAHB officers, including Downs and Mitchell, mounted a campaign to remove Riggs from the HBI presidency by undermining his efforts as President. *Id.* ¶¶ 24–25. Despite a decision made by HBI staff during a March 2000 retreat to transfer NAHB's continu-

ing member education and training programs from NAHB to HBI, for example, Riggs experienced hostility and obstruction from Downs and Mitchell when trying to implement the strategic plan. *Id.* ¶ 26. Downs further refused Riggs's request to present the plan to senior officials of NAHB at a meeting to be held at the Greenbrier in April 2000, choosing instead merely to refer to a letter written by Riggs. *Id.* ¶¶ 27–30. Minutes from the meeting reflect that senior officers at the meeting discussed the " 'reporting relationship' between HBI's president and NAHB's CEO as a 'difficult situation that need[ed] to be addressed immediately' "and decided to contact their appointees to the HBI Board to determine "future action." *Id.* ¶ 30.

On April 17, 2000, Downs informed Riggs that NAHB's senior officers had unanimously decided to terminate his employment. *Id.* ¶ 31. HBI's Board of Trustees were not involved in the decision of NAHB's senior officers to terminate Riggs's employment, and Woods refused to give Riggs permission to address the full HBI Board of Trustees about his termination out of deference to NAHB and its senior officers. *Id.* ¶¶ 32–33. Woods then exerted pressure upon Riggs to submit his resignation, and having not received his resignation by May 5, 2000, the Executive Committee of HBI's Board of Trustees voted to terminate his employment, which was ratified by the full board on May 13, 2000. *Id.* ¶¶ 34–38.

On February 26, 2001, Riggs filed a complaint against Defendants, alleging three counts.[2] Count I charges HBI with wrongful discharge in violation of public policy. *Id.* ¶¶ 41–47. Count II alleges tortious interference with contract and

---

2. With the consent of all the defendants, Riggs sought and received leave of Court to amend his complaint on May 16, 2001. The amendment changed only one sentence, correcting a reference to Mitchell as a Trustee of HBI.

prospective advantage against NAHB, Downs, and Mitchell. *Id.* ¶¶ 48–54. Count III charges all the defendants with civil conspiracy to wrongfully terminate his employment with HBI. *Id.* ¶¶ 55–58. Riggs seeks an award of compensatory and consequential damages in an amount of no less than $2.000,000, punitive damages against each of the defendants in the amount of $5,000,000, reinstatement and back pay, and attorneys' fees and costs. *Id.* at 24.[3] All the defendants have moved to dismiss Riggs's complaint, contending that it fails to state a claim upon which relief may be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II. DISCUSSION

### A. Standard of Review

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) will be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) ("A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."). In reviewing such a motion, the Court must construe the complaint in the light most favorable to plaintiff and must accept as true all allegations and all reasonable factual inferences drawn from well-pleaded factual allegations. *See Square D. Co. v. Niagara Frontier Tariff Bureau, Inc.,* 476 U.S. 409, 411, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986); *In re United Mine Workers Employee Benefit Plans Litig.,* 854

F.Supp. 914, 915 (D.D.C.1994). "However, the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994) (citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)).

### B. Analysis

#### 1. Wrongful Discharge, Civil Conspiracy, and Defendant HBI

##### (a) District of Columbia's At–Will Employment Doctrine

There is no dispute between the parties in this case over the fact that Riggs's employment with HBI was at-will. And as a general rule, District of Columbia law has long recognized the at-will employment doctrine, which states that "an employer may discharge an at-will employee at any time and for any reason, or for no reason at all." *Adams v. George W. Cochran & Co.,* 597 A.2d 28, 30 (D.C.1991) (citing *Wemhoff v. Investors Mgmt. Corp.,* 528 A.2d 1205, 1208 n. 3 (D.C.1987); *Taylor v. Greenway Restaurant, Inc.,* 173 A.2d 211 (D.C.1961); *Pfeffer v. Ernst,* 82 A.2d 763, 764 (D.C.1951)). In *Adams,* however, the D.C. Court of Appeals recognized an intentional tort for wrongful discharge, holding that "there is a very narrow exception to the at-will doctrine under which a discharged at-will employee may sue his or her former employer for wrongful discharge when the sole reason for the discharge is the employee's refusal to violate the law, as expressed in a statute or municipal regulation." 597 A.2d at 34. The

---

**3.** Jurisdiction before this Court is predicated upon diversity of citizenship between the parties, *see* 28 U.S.C. § 1332(a)(1), as Plaintiff is a citizen of Virginia, Defendants HBI and NAHB are headquartered in the District of Columbia, and Defendants Downs and Mitchell are citizens of Maryland, and the amount in controversy exceeds $75,000.

plaintiff in *Adams* was a truck driver who was fired after he refused to drive a truck that did not have an inspection sticker on its windshield, which would have been illegal under municipal regulations. *Id.* at 29–30 & n. 1 (citing 18 DCMR § 602.4 (1987)). In recognizing the "narrow exception" to the at-will doctrine, the court reasoned:

> Adams was forced to choose between violating the regulation and keeping his job—the very choice which ... he should not have been required to make. Even though the criminal liability facing him was not very great, it was nonetheless unacceptable and unlawful for his employer to compel him to choose between breaking the law and keeping his job.

*Id.* at 34.

The D.C. Court of Appeals initially resisted further expansion of the "narrow exception" recognized in *Adams*. In *Gray v. Citizens Bank of Washington,* for example, the court "[c]onclud[ed] under [prior] decisions that a division of the court is not free to expand the *Adams* exception" and thus affirmed the dismissal of a complaint by a plaintiff bank official who was fired after reporting to a senior official on numerous occasions evidence of possible illegal conduct by another managerial employee related to bank operations. 602 A.2d 1096, 1096–97 (D.C.1992), *overruled by Carl v. Children's Hosp.,* 702 A.2d 159, 160 (D.C.1997) (en banc) ("There is nothing in the *Adams* opinion that bars this court—either a three-judge panel or the court en banc—from recognizing some other public policy exception when circum-

stances warrant such recognition. On this point a majority of the en banc court agrees. To the extent that *Gray v. Citizens Bank* holds differently, it is overruled."). In *Thigpen v. Greenpeace, Inc.,* the court similarly affirmed the dismissal of a complaint by a plaintiff payroll clerk who had discovered his employer's violation of D.C. minimum wage laws, notified two superiors of violations, filed a complaint after no action was taken, and was discharged. 657 A.2d 770, 771 (D.C.1995). The court explained that the *Adams* "exception requires an outright refusal to violate a specific law, with the employer putting the employee to the choice of breaking the law or losing his job." *Id.* And in *Washington v. Guest Services., Inc.,* the court affirmed summary judgment in favor of employer, albeit only preliminarily, based upon the trial court's conclusion that the employer had not put the plaintiff dietary aide and cook at a retirement home, who had alleged that she had been wrongfully discharged in retaliation for attempting to ensure compliance by a fellow employee with D.C. health a food regulations, "to the choice of disobeying [her obligation not to prepare or serve unfit food] as the price for keeping her job." 703 A.2d 646, 646 (D.C.1997) (per curiam).[4]

Despite its initial resistance to expansion of the public policy exception to the at-will doctrine, however, the court eventually clarified in *Carl* that "the 'very narrow exception' created in *Adams* should not be read in a manner that makes it impossible to recognize any additional public policy exceptions to the at-will doctrine that may warrant recognition." 702 A.2d at 160.

---

**4.** As explained below, however, the court also ordered additional briefing from the parties on the question of whether *Carl,* 702 A.2d at 160, could be applied retroactively to the case. *Id.* at 646–47. Subsequently concluding that it could be applied retroactively, the court ultimately held that "although the trial

judge's decision correctly reflected the case law at the time the motion was decided, the basis for his ruling has been superseded by [*Carl,* 702 A.2d at 160]," and it therefore vacated its opinion, reversed the trial court, and remanded the case. *Washington v. Guest Servs., Inc.,* 718 A.2d 1071, 1073–74.

The plaintiff in *Carl*, a part-time nurse, alleged that she had been wrongfully discharged because she had advocated for patients' rights and against her employer's interests both before the Council of the District of Columbia and in court as an expert witness for plaintiffs in medical malpractice cases. *Id.* She relied principally upon the policy embodied by D.C.Code § 1–224 (1992), which made it a criminal offense "to corruptly or by threat of force, or by any threatening letter or communication, endeavor[ ] to influence, intimidate, or impede any witness in any proceeding pending before the Council." D.C.Code § 1–224 (1992), *quoted in*, *Carl*, 702 A.2d at 160 n. 2. She did not claim that her former employer had threatened her or otherwise violated section 1–224 or that the statute created a private right of action, but rather, that her termination was actionable as a public policy exception to the at-will doctrine. A division of the D.C. Court of Appeals affirmed the trial court's denial of relief because of the court's prior cases. *Carl*, 702 A.2d at 159. But the court granted the plaintiffs petition for rehearing en banc "to consider her contention that the narrow public policy exception to the employment-at-will doctrine ... first recognized in [*Adams*] should be expanded to include the rights of employees to speak out publicly on issues affecting the public interest without fear of retalia-

tion by their employers." *Id.* A majority of the en banc court held that *Adams* did "not foreclose any additional 'public policy' exceptions to the general rule that employment contract are always at will unless they expressly-provide otherwise," *id.*, and that the complaint stated a claim upon which relief could be granted because it fell within a public policy "solidly based" on, or "firmly anchored" in, section 1–224, *id.* at 163–64 & n. 6 (Terry, J., concurring); *see Washington*, 718 A.2d at 1080. The court, through a concurring opinion penned by Judge Terry,[5] articulated the following standard for the appropriate case-by-case analysis for recognizing additional public policy exceptions under *Carl:*

> Future requests to recognize such exceptions, therefore, should be addressed only on a case-by-case basis. This court should consider seriously only those arguments that reflect a clear mandate of public policy—i.e., those that make a clear showing, based on some identifiable policy that has been "officially declared" in a statute or municipal regulation, or in the Constitution, that a new exception is needed. Furthermore, there must be a close fit between the policy thus declared and the conduct at issue in the allegedly wrongful termination.

---

5. Although only three other judges joined this language in Judge Terry's concurrence, four other judges would have construed the public policy exception to the at-will doctrine more broadly. *See, e.g., Carl.* 702 A.2d at 166 (Ferren, J., concurring, joined by Mack, J.) ("In addition, I join Judge Schwelb's and Judge Mack's opinions ... which elaborate very ably why the public policy exception to the at-will employment doctrine applies more broadly than Judge Terry would have it in Part IB of his opinion."); *id.* at 186–87 (Mack, J., concurring, joined by Ferren, J., Reid, J., and Schwelb, J.) ("Judge Terry ... would, therefore, restrict this court's recogni-

tion of such exceptions to only those cases where the exception is firmly anchored or solidly based in a statute or regulation which clearly reflects the 'public policy' being relied upon. For the reasons stated at length [below], I cannot agree to such a drastic restriction."). While a majority of judges on the en banc court therefore did not explicitly articulate the precise confines of the public policy exception to the at-will doctrine, Judge Terry's concurrence appears to at least implicitly represent the broadest demarcation of its boundaries acceptable to a majority of the court.

*Carl*, 702 A.2d at 164 (Terry, J., concurring) (footnotes omitted); *see Fingerhut v. Children's Nat'l Med. Ctr.*, 738 A.2d 799, 803 (D.C.1999). Clarifying the required relationship between the particular public policy at issue and the statute or regulation from which it should be derived, the court further cautioned that "lest we allow 'public policy' exceptions to swallow up the at-will doctrine ... the recognition of any such exception must be firmly anchored either in the Constitution or in a statute or regulation which clearly reflects the particular 'public policy' being relied upon." *Carl*, 702 A.2d at 162 (Terry, J., concurring); *see Fingerhut*, 738 A.2d at 803 n. 7.[6]

The court then held that *Carl* could be retroactively applied to the plaintiff's complaint in *Washington v. Guest Services, Inc.* 718 A.2d 1071, 1072, 1074–80 (1998). As discussed above, the plaintiff in *Washington* was a former dietary aide and cook at a retirement home who alleged that her employment had been wrongfully terminated in retaliation for her attempts to ensure compliance by a fellow employee with D.C. health a food regulations. She proffered a sworn affidavit specifically stating that she had directed a fellow employee to stop spraying stainless steel cleaner in the area where she was cooking and that the manager who had instructed the other employee to spray the cleaner accused her of insubordination, which was the sole reason he terminated her. *Id.* at 1072–73. She claimed that her coworker's action of spraying the cleaning material

near the food she was cooking violated various D.C. food and health regulations and that she had been terminated "for protesting safety, health, and food code violations on the part of the defendant." *Id.* at 1073 & n. 1 (citing 23 DCMR §§ 2101.1, 2200.2, 3010.1 (1990) and D.C.Code § 22–3416 (1996)). Despite the court's earlier preliminary affirmance of summary judgment for the employer, the court concluded after further briefing from the parties that *Carl* could be retroactively applied to the case, and it held under Carl that the allegations contained in the plaintiff's sworn affidavit were sufficient to survive summary judgment: "To permit an employee to be fired for such actions would undermine the purposes of the food and health regulations and would frustrate the public policy of which these regulations are an expression." *Id.* at 1080–81.

The court subsequently applied the *Adams* and *Carl* exceptions in *Fingerhut*, 738 A.2d at 799. The plaintiff there was a Director of Security for Children's National Medical Center ("CNMC") and a specially commissioned police officer under the D.C.Code.[7] After learning about a bribe that his employer wished to make to the D.C. Minority Business Opportunity Commission in conjunction with a construction project, the plaintiff informed a D.C. police lieutenant and the FBI. Over the course of several months, the plaintiff supplied the FBI with information for its

---

6. To describe this relationship, Judge Terry variously used phrases such as "carefully tethered," "firmly anchored," and "solidly based" synonymously in his opinion. *Carl*, 702 A.2d at 164 n. 6 (Terry, J., concurring).

7. Under the pertinent section of the D.C.Code,

The Mayor of the District of Columbia, on application of any corporation or individual, or in his own discretion, may appoint special policeman for duty in connection

with the property of, or under the charge of, such corporation or individual; said special policeman to be paid wholly by the corporation or person on whose account their appointments are made, and to be subject to such general regulations as the Council of the District of Columbia may prescribe.

D.C.Code § 4–114 (1994). *quoted in, Fingerhut*, 738 A.2d at 800 n. 1.

investigation of the matter. During the same period, however, the plaintiff developed a relationship with the Vice President of Human Resources for CNMC and at one point informed the Vice President about the bribery scheme, his involvement with the FBI, and the possibility of upcoming arrests. The plaintiff was terminated shortly thereafter. *Id.* at 800–01. The court first concluded that it "need not decide whether Fingerhut ha[d] stated a cause of action under *Adams* because [it was] satisfied that his complaint state[d] a claim under *Carl.*" *Id.* at 805. Construing Judge Terry's concurrence in *Carl* as the majority view of the en banc court, *id.* at 803 & n. 7, the court next applied the standards articulated therein and reasoned as follows:

> We conclude that Fingerhut has made the requisite allegations under *Carl.* The
>> three statutes on which he relies, §§ [ ] 4–142, 22–704 and 4–175, in concert with § 4–114 and its implementing regulations, "reflect a clear mandate of public policy" that has been declared in statute and regulation: a policy against the termination of a special police officer who records and reports a bribe of a government official, and who assists the FBI in the investigation of corrupt influence with respect to a federal government construction grant. There is a "close fit," *Carl,* [ ] 702 A.2d at 164, between this policy and CNMC's alleged decision not only to terminate Fingerhut after he informed CNMC of pending arrests and his role in the investigation of the bribe, but also to fill Fingerhut's position with the Assistant Director of Security even though the stated reason for Fingerhut's termination was a reduction in force. Indeed, as we said in *Guest Servs.,* … "The relationship between [Fingerhut's] discharge and the applicable public policy was … closer in time and more palpable than in *Carl* …." 718 A.2d at 1080.

*Id.* at 805–07.

The Court of Appeals for this Circuit similarly addressed *Adams, Carl,* and their progeny in *Liberatore v. Melville Corporation,* 168 F.3d 1326 (D.C.Cir.1999). The plaintiff, an at-will pharmacist-manager for CVS, noticed that after the drug store had been relocated to a glass-enclosed area inadequate temperature control was adversely affecting the condition of certain drugs. The plaintiff brought the problem to the attention of two supervisors and other upper-level management officials. They informed him that they were working on it, but the problem nonetheless persisted for several months. He finally told the Area Vice President that although he did not wish to do so, he would notify his neighbor, an official with the FDA, about the problem if it were not fixed. That evening, management authorized the removal of $250,000—worth of drugs from the pharmacy for destruction. A few days later, the plaintiffs immediate supervisor notified the loss prevention department that other drugs were missing from inventory. Management targeted the plaintiff as a suspect and ultimately terminated his employment. *Id.* at 1328. In support of his claim for wrongful discharge, the plaintiff cited various federal and D.C. statutes and regulations concerning the proper storage of drugs. *Id.* at 1331 (citing 21 C.F.R. §§ 210.1(b), 211,142(b); 21 U.S.C. §§ 333(a)(1) 351; D.C.Code § 2–2013(a) (1981)). Construing the proper standard to be applied under *Carl,* the court stated:

> Although there was no agreement by the D.C. Court of Appeals in *Carl* about the nature of the conduct that would qualify under its expanded public policy exception, the separate views of the judges indicate that "the effective holding of the en banc court," 702 A.2d at

197 n. 2 (Steadman, J. dissenting), is that circumstances other than an employee's outright refusal to violate a law constitute grounds for a public policy exception if "solidly based on a statute or regulation that reflects the particular public policy to be applied." *Id.* at 163; *see also id.* at 164 n. 6 (Terry, J.). *Liberatore*, 168 F.3d at 1331. It then held that the plaintiff's allegations were sufficient to state an actionable claim ·under *Carl:*

> The conduct that Liberatore claims resulted in his termination implicates the public policy underlying the legal proscriptions on the storage and handling of drugs.... His claim that he was discharged for his threat to report conditions to the FDA that were in violation of federal and District of Columbia laws protecting the public from the purchase of adulterated drugs implicates the kind of public policy embodied in a statute or regulation underlying the D.C. Court of Appeals' decision in *Carl* to expand *Adams'* narrow exception to the at-will employment doctrine.

*Id.; cf., e.g., Gutierrez v. Berg Contracting Inc.,* No. 99–04(TAF), 2000 WL 331721, at *2–3 (D.D.C. Mar.20, 2000) (holding that plaintiff construction workers' wrongful termination claim failed as a matter of law when, even assuming *arguendo* that retaliation for assertion of rights under federal and D.C. labor laws would state a colorable claim under *Carl,* plaintiffs did not show a close fit between such a policy and the relevant conduct at issue in that they failed to "allege that they were fired for refusing to work for hours that they were not paid ... alleg[ing] rather that they refused to work at all, even though they were being fully paid for forty hours of work a week," which essentially constituted a coercive striking strategy not recognized by any statutory-based policy).

**(b) Riggs's Claims Against HBI**

 In this case, HBI contends that Riggs has failed to state a cognizable wrongful discharge claim. HBI first argues that the *Adams* exception to the at-will doctrine is inapplicable as a matter of law because neither section 501(c)(3) nor 20 C.F.R. 638.814 prohibits the political activities described in the complaint. Even if the laws prohibit the alleged activities, HBI alternatively posits, Riggs still has failed to state a claim under *Adams* because the laws do not apply to him individually or subject him to personal liability. Second, HBI asserts that even if the laws prohibited the alleged activities, Riggs cannot satisfy the criteria for creating a new public policy exception under *Carl.* Finally, HBI argues that because Riggs's allegations fail to state a wrongful discharge claim, his civil conspiracy count necessarily fails as a matter of law for want of an actionable underlying tort. Riggs counters that the allegations of his complaint—that HBI terminated his employment "solely because he refused to participate in activities prohibited by federal tax laws and DOL regulations, and because he repeatedly insisted that HBI comply with federal tax laws and act in conformance with DOL regulations," Compl. ¶ 43—satisfy the requirements for stating a colorable claim for wrongful discharge under *Adams* and *Carl.*

**(i) *Wrongful Discharge Under Adams***

 As set out above, to fall within the "very narrow" *Adams* exception, a plaintiff must allege—and ultimately prove—that the sole reason for his discharge was his refusal to violate the law; he must have been forced to choose between violating the law and keeping his job. *Adams.* 597 A.2d at 34; *accord Thigpen v. Greenpeace, Inc.,* 657 A.2d 770, 771 (D.C.1995) (explaining that the *Adams* "exception requires an

outright refusal to violate a specific law, with the employer putting the employee to the choice of breaking the law or losing his job"); *Mandsager v. Jaquith*, 706 A.2d 39, 42 (D.C.1998) (denying relief under *Adams* where "there was no express direction given to the employee to do an act that would violate the law and there was never an outright refusal, on the employee's part, to [do the] act which may, or may not, have been illegal.").

Riggs predicates his wrongful discharge claim against HBI in this case upon violations of section 501(c)(3) of the Internal Revenue Code and DOL regulation 20 C.F.R. § 638.814. Section 501(c)(3) exempts from taxation only an organization that can satisfy, *inter alia*, the following two requirements relevant to this case: (1) "no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation"; and (2) "which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office." 26 U.S.C. § 501(c)(3).[8] With respect to the former requirement, an organization will not operationally qualify for exemption if "a substantial part of its activities is attempting to influence legislation by propaganda or otherwise." 26 C.F.R. § 1.501(c)(3)–1(c)(3)(ii).[9] "For this purpose, an organization will be regarded as attempting to influence legislation if the organization: (a) Contacts, or urges the public to contact, members of a legislative body for the purpose of proposing, supporting, or opposing legislation; or (b) Advocates the adoption or rejection of legislation." *Id.* Respecting the latter requirement of section 501(c)(3)—not participating or intervening in a political campaign—"[a]ctivities which constitute participation or intervention in a political campaign on behalf of or in opposition to a candidate include, but are not limited to, the publication or distribution of written or printed statements or the making of oral statements on behalf of or in opposition to such a candidate." *Id.* In addition to section 501(c)(3). Riggs relies upon a DOL regulation that prohibits "funds provided under the [Job Training Partnership] Act [from being] used in any way":

(a) To attempt to influence in any manner a member of Congress to favor or oppose any legislation or appropriation by Congress;

(b) To attempt to influence in any manner a member of a State or local legisla-

---

8. In full measure, section 501(c)(3) exempts only the following organizations:

 Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), and

 which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office.

26 U.S.C. § 501(c)(3).

9. An organization must satisfy organizational and operational tests to qualify for exemption under the Internal Revenue Code. 26 C.F.R. § 1.501(e)(3)–1(a)(1) ("In order to be exempt as an organization described in section 501(c)(3), an organization must be both organized and operated exclusively for one or more of the purposes specified in such section. If an organization fails to meet either the organizational test or the operational test, it is not exempt.").

ture to favor or oppose any legislation or appropriation by such legislature;

(c) For any activity which involves political activities; or

(d) For any activity which will assist, promote, or deter union organizing.

20 C.F.R. § 638.814.

With respect to section 501(c)(3), Riggs alleges in his complaint that NAHB "expected him as HBI's President to play an improper political role on behalf of NAHB, and to use his influence as a former congressman and national leader of the Republican Party to advance NAHB's efforts to influence political campaigns and legislation." Compl. ¶ 15. He further alleges that "Defendants' termination of Mr. Riggs' employment was not based on deficiencies in his performance as HBI's president[; rather, the defendants terminated him] only because Mr. Riggs refused to participate in activities prohibited by federal tax laws and DOL regulations." *Id.* ¶ 39. Examples of unlawful activities cited by Riggs include his attendance at political receptions for congressmen, *id.* ¶ 15, attendance at the Republican National Convention, *id.* ¶ 16, participation in weekly NAHB leadership discussions of NAHB's "political and legislative agenda," *id.* ¶ 17, and participation in NAHB's Palm Harbor leadership session that focused on endorsing a presidential candidate, "forming an election fund raising vehicle," and pressuring elected officials to support legislation, *id.* ¶ 18. *See* Pl.'s Opp'n at 15–16.

The sufficiency of Riggs's allegations for the current purposes of Rule 12(b)(6) is a close question. On one hand, there is some appeal to HBI's argument, for example, that merely attending political receptions and conventions and/or participating in private NAHB meetings violate none of the proscriptions in section 501(c)(3) and 20 C.F.R. § 638.814. That is, Riggs's attendance at a couple political receptions

for congressmen and at one Republican National Convention alone would fall significantly short of showing that Riggs and HBI spent a "substantial part of [their] activities ... carrying on propaganda, or otherwise attempting, to influence legislation." 26 U.S.C. § 501(c)(3). In other words, Riggs's complaint does not specifically allege that he and HBI "contact[ed], or urge[d] the public to contact, members of a legislative body for the purpose of proposing, supporting, or opposing legislation," or that they "[a]dvocate[d] the adoption or rejection of legislation." 26 C.F.R. § 1.501(3)–1(c)(3)(ii). In similar fashion, attendance at such events by itself does not demonstrate "participat[ion] in, or interven[tion] in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office." 26 U.S.C. § 501(c)(3). That is, mere attendance does not necessarily represent an activity akin to "the publication or distribution of written or printed statements or the making of oral statements on behalf of or in opposition to ... a candidate." 26 C.F.R. § 1.501(c)(3)–1(c)(3)(ii).

On the other hand, the Court must read Riggs's complaint, for the current purposes of Rule 12(b)(6), in light of the liberal standard of Rule 8. *See, e.g., Atchinson v. District of Columbia*, 73 F.3d 418, 421 (D.C.Cir.1996). As the Court of Appeals for this Circuit has explained:

Rule 8(a)(2) requires that a complaint include "a *short* and *plain* statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) (emphasis added). According to Rule 8(e), "[e]ach averment of a pleading shall be simple, concise, and direct. No technical forms of pleadings or motions are required." Rule 8(f) instructs courts to construe "[a]ll pleadings ... to do substantive justice." Under the Federal

Rules, the purpose of pleading is simply to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests," not to state in detail the facts underlying a complaint. *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see Sinclair v. Kleindienst,* 711 F.2d 291, 293 (D.C.Cir.1983). The Federal Rules establish a regime in which "simplified" pleadings provide notice of the nature of claims, allowing parties later "to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues" through "the liberal opportunity for discovery and other pretrial procedures established by the Rules." *Conley,* 355 U.S. at 47–48 & n. 9, 78 S.Ct. 99. A complaint, in other words, need not allege all that a plaintiff must eventually prove.

*Atchinson,* 73 F.3d at 421–22. While it is true that the Court does not have to "accept legal conclusions cast in the form of factual allegations," *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994) (citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)), it is equally true that Riggs's complaint "need not allege all that [he] must eventually prove," *Atchinson,* 73 F.3d at 422, to survive HBI's motion. As stated above, dismissal is warranted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley,* 355 U.S. at 45–46, 78 S.Ct. 99; *see Hishon v. King & Spalding,* 467 U.S. 69,

73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) ("A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.").

Under these liberal pleading standards, the Court cannot find beyond a doubt that Riggs will be able to "prove no set of facts in support of his [*Adams* ] claim which would entitle him to relief." *Conley,* 355 U.S. at 45–46, 78 S.Ct. 99. While Riggs's alleged unlawful political activity examples of attending political receptions and conventions and participating in NAHB meetings and a party convention are too broad to ultimately substantiate a violation of section 501(c)(3), it is not inconceivable that Riggs may be able to show with the requisite specificity through the development of the record that HBI asked him to attend the Republic National Convention, for example, to "contact[ ] . . . members of a legislative body for the purpose of proposing, supporting, or opposing legislation," 26 C.F.R. § 1.501(c)(3)–1(c)(3)(ii), to "[a]dvocate[ ] the adoption or rejection of legislation," *id.,* or to "participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office," 26 U.S.C. § 501(c)(3).[10] Such a showing would evidence a violation of section 501(c)(3). Riggs may be able to similarly bear out additional facts necessary to support his other allegations, including the defendants' expectation of his participation in weekly NAHB leadership discussions of NAHB's "political and legislative agenda," Compl.

**10.** Riggs has also specifically alleged that at the time Downs asked him to attend the convention, Downs "emphasized . . . that NAHB had established a $1 million 'soft money' fund to distribute to the presidential campaigns, either through the national party committees or an independent effort like 'Builders for Bush.' " Compl. ¶ 16. While this allegation by itself does not establish a violation of section 501(c)(3), it bolsters the reasonableness of construing an inference in favor of the plaintiff, for the current purposes, that NAHB sought his assistance in actions at the convention violative of section 501(c)(3) and that HBI fired him because of his express refusal to cooperate.

¶ 17, and in NAHB's Palm Harbor leadership session, which focused on endorsing a presidential candidate, "forming an election fund raising vehicle," and pressuring elected officials to support legislation, *id.* ¶ 18. In other words, the primary fault with Riggs's complaint at this point in time is the breadth of its allegations; it does not specify precisely how the alleged activities violate section 501(c)(3) under the relevant regulations. Without significant factual development by Riggs, explaining in greater detail how the examples he has provided constitute violations of section 501(c)(3) under the interpretations discussed above, Riggs ultimately will be unable to sustain his wrongful discharge claim against HBI pursuant to *Adams.*[11] Yet while Riggs's allegations are over broad, they do not, for example, contradict the necessary facts he must ultimately establish, *see, e.g., Henthorn v. Dep't of Navy,* 29 F.3d 682, 687 (D.C.Cir.1994), and the Court cannot find that Riggs is incapable of proving a set of facts in support of his *Adams* claim that would entitle him to relief, *Conley,* 355 U.S. at 45–46, 78 S.Ct. 99. Thus, the Court concludes that under the liberal pleading regime of Rule 8, dismissal would be inappropriate at this time, despite the fact that Riggs's complaint falls short of alleging all the facts that he will eventually have to prove to establish violations of section 501(c)(3) as a predicate for fitting into the *Adams* exception to the at-will doctrine. *See Atchinson,* 73 F.3d at 421–22.

The Court views Riggs's alleged violations of 20 C.F.R. § 638.814 in the same light. In one respect, the regulation's language is significantly broader in restrictive scope: it bars the use of JTPA funds from being used for "*any activity which involves political activities.*" 20 C.F.R. § 638.814 (emphasis added). In another respect, however, the regulation is much narrower in that it bars *only the use of JTPA funds* for such purposes. *Id.* HBI accordingly asks for dismissal on the basis that "[w]hile Plaintiff alleges that DOL grants account for approximately $14 million of HBI's $18 million annual budget, Plaintiff does not (and cannot) allege that any of the so-called 'political activities' were (or would have been) financed with DOL funds." HBI Mot. at 13. HBI further states that to the contrary, "Plaintiff alleges that each of the so-called 'political activities' were (or would have been) financed *by NAHB,* which does not receive funds under the [JTPA]." *Id.* (emphasis in original). But Riggs correctly counters that he did not allege that the activities alleged were financed by NAHB. Rather, he alleged that $14 million of HBI's $18 million budget came from DOL grants and that only HBI paid his salary. Compl. ¶¶ 3–4. Thus, he asserts, "[i]n the absence of evidence to the contrary . . . these facts support the reasonable inference that HBI intended to pay for Mr. Riggs' attendance at the Republican National Convention and his participation in the Palm Harbor meeting." Pl.s Opp'n at 23. That is, "[b]y participating in these events, Mr. Riggs would have been using the resources of a Section 501(c)(3) organization and doing so

---

**11.** Toward this end, the Court finds Riggs's current reliance on *general* statements concerning the breadth of proscribed political activities contained in an IRS *press release,* an IRS General Counsel Memorandum that explicitly states that the "*document is not to be relied upon or otherwise cited as precedent by taxpayers,*" and an IRS continuing education *online article, see* Pl.'s Opp'n at 18 (citing I.R.B. 96–23, 1996 IRB Lexis 142 (Apr. 24, 1996); Gen.Couns.Mem. 39,414, 1985 IRS GCM Lexis 89, *9–10 (Sept. 25, 1985) (emphasis added); W. Thomas and J. Kindell, "Affiliations Among Political, Lobbying and Education Organizations," IRS Exempt Organizations Continuing Professional Education Technical Instruction Program for FY 2000), misplaced.

on a salary that was likely paid in whole or in great part by Job Corps funds." *Id.* In its reply, HBI ostensibly retracts its statement that Riggs alleged that his activities were "financed by NAHB," but maintains that Plaintiff has alleged "no facts to suggest that DOL funds would have been used to finance the so-called 'political activities'" and that "such an inference is laughably unreasonable" because "the *most* logical inference is that NAHB—and not HBI—intended to pay for Plaintiffs attendance." HBI Reply at 14 (emphasis in original).

As with his other allegations, Riggs's claims concerning the unlawful funding of the political activities at the heart of his complaint are insufficient for one to ultimately conclude that DOL funds were actually used to pay for them, in violation of 20 C.F.R. § 638.814. Despite Riggs's proffered inference—that because seventy-eight percent of HBI's budget is comprised of DOL funds and that HBI paid his salary, DOL funds were used to pay for the alleged political activities—one could also reasonably infer that NAHB, with non-DOL funds, paid for the alleged activities, as suggested by HBI. But, as stated above, Riggs "need not allege all that [he] must eventually prove," *Atchinson,* 73 F.3d at 422, for current purposes; the Court is constrained at this juncture to construe all reasonable inferences in favor of the plaintiff. Given that seventy-eight percent of HBI's budget was comprised of DOL funds and that HBI paid Riggs's salary, the Court concludes that the inference Riggs asks the Court to make is not unreasonable. As with his alleged violations of section 501(c)(3), therefore, the Court cannot conclude that Riggs will be unable to show that DOL funds were used to finance the political activities he alleges, in violation of 20 C.F.R. § 638.814. Dismissal is thus inappropriate at this stage of the litigation.

Although HBI attacks Riggs's *Adams* claim primarily on the basis that none of the allegations in his complaint constitute violations of section 501(c)(3) and 20 C.F.R. § 638.814, the Court notes that the *Adams* exception requires not only a showing that the purported activities would have violated these provisions, but also a showing by Riggs of "an outright refusal to violate [them], with the employer putting the employee to the choice of breaking the law or losing his job." *Thigpen,* 657 A.2d at 771; *accord Mandsager,* 706 A.2d at 42 ("We also held in *Thigpen* that a 'constructive refusal to violate the law' is not sufficient; there must be an express refusal to do the act that violates the law."). A review of Riggs's complaint, however, reveals a problem in this regard: he concedes that he agreed to go to the receptions, albeit reluctantly, on behalf of HBI. Compl. ¶ 15. To the degree that he relies exclusively on his *attendance* as the unlawful activity, his failure to refuse to attend the receptions would thus bar relief under *Adams,* first because of his failure to refuse to violate the laws, *see Thigpen,* 657 A.2d at 771, and second, because the "sole reason" for his termination could not have been his refusal to violate the law. Despite this concession, however, Riggs adds that "he was uncomfortable with Mr. Downs'[s] request that he play a political role on NAHB's behalf—particularly with Mr. Lazio, who, as Chairman of the House of Representatives Housing Subcommittee at the time, was an influential member of the U.S. House of Representatives on issues of importance to NAHB." Compl. ¶ 15. Construing a reasonable inference in favor of Riggs, it may be that Riggs will be able to show that the *attendance* per se was not the purported illegal activity, but rather, the expectation by HBI, for example, that he "contact[ ] . . . members of a legislative body for the purpose of propos-

ing, supporting, or opposing legislation," 26 C.F.R. § 501(c)(3)–1(c)(3)(ii), which he expressly refused to do.

HBI encourages the Court to reject such inferences, citing *Mandsager*, 706 A.2d at 39, for the proposition that Riggs's wrongful discharge claim pursuant to *Adams* fails as a matter of law because it is based on unsupportable assumptions. HBI Mot. at 14. In *Mandsager*, the plaintiff clerical worker was asked to send out a solicitation mailing on behalf of her employer, a nonprofit environmental and national security news service. 706 A.2d at 40–41. The plaintiff discovered, however, that her employer was not registered in Maryland or Virginia, two states to which the solicitation mailing would be sent. The undisputed evidence in the record, contained in affidavits and deposition testimony, showed that the plaintiff and her employer had a conversation about the mailing, during which the plaintiff "suggested several ways the [alleged unlawful] mailing could be accomplished without violating the law." *Id.* at 41. The plaintiff admitted that during that conversation, "at no time was she instructed ... to send out a mailing that violated any state law" and that "she never refused to make the mailing." *Id.* In addition, the plaintiff and her employer discussed her performance in general, including her failure to obtain the necessary registrations. *Id.* The D.C. Court of Appeals affirmed summary judgment in favor of the defendant because the undisputed evidence showed that "the employer had not put [the plaintiff] to the choice of either violation the law or being fired if she refused to do so." 706 A.2d at 40–42. In so doing, the court rejected the plaintiffs argument that it was reasonable to infer from the sequence of events that the sole reason for her termination was her refusal to violate the law, because "[t]hat contention [did] not square with [the court's] interpretation of the operative

language in *Adams* and is belied by [Plaintiff] Mandsager's own testimony." *Id.* at 42. From the undisputed evidence in the record, the court reasoned:

> Mandsager knew, because she had researched the point as reflected in her memo, that there were ways to conduct the mailing legally, such as by completing the registration requirement first. In light of that, even an express direction to mail the solicitation, without more, would not constitute an order to do an act that was necessarily illegal. Furthermore, as Mandsager conceded in her deposition, she never told Jaquith that she would not conduct the mailing. It is not entirely clear why there was no explicit refusal; however, it is fair to assume on these facts that there was no occasion to refuse to conduct an illegal mailing, because no express instruction to make such a mailing was given.... In sum, there was no express direction given to the employee to do an act that would violate the law and there was never an outright refusal, on the employee's part, to conduct the mailing, an act which may, or may not, have been illegal. We agree with the trial court that Mandsager was never "put to the 'Hobson' choice of either doing an illegal act, i.e., putting the solicitations in the mail stream without proper registration first having been achieved, or being fired if she did not elect the former course." Therefore she is not entitled to relief.

*Id.* at 42. But *Mandsager*, because it was decided after the court's review of undisputed evidence in the record for the purposes of summary judgment, is inapposite for the Court's current purposes of deciding whether dismissal under Rule 12(b)(6) is appropriate, in light of the liberal federal pleading regime of Rule 8. While *Mandsager* could in the end bar Riggs's claims

here, he has not yet had an opportunity to develop a record to flush out the necessary factual support for his allegations.

### (ii) Wrongful Discharge Under Carl

 Under the prevailing construction of *Carl*, as discussed above, requests to recognize additional public policy exceptions to the at-will employment doctrine should be addressed on a case-by case basis pursuant to the following instructions:

Th[e] court should consider seriously only those arguments that reflect a clear mandate of public policy—i.e., those that make a clear showing, based on some identifiable policy that has been "officially declared" in a statute or municipal regulation, or in the Constitution, that a new exception is needed. Furthermore, there must be a close fit between the policy thus declared and the conduct at issue in the allegedly wrongful termination.

*Carl*, 702 A.2d at 164 (Terry, J., concurring) (footnotes omitted); *accord Liberatore*, 168 F.3d at 1331 (stating that " 'the effective holding of the en banc court' " in *Carl* is that circumstances other than an employee's outright refusal to violate a law constitute grounds for a public policy exception if " 'solidly based on a statute or regulation that reflects the particular public policy to be applied' ") (quoting *Carl* 702 A.2d at 197 n. 2 (Steadman, J., dissenting), 163 (Terry, J., concurring)); *see Fingerhut*, 738 A.2d at 803. 805–07. "[T]he recognition of any such exception must be firmly anchored either in the Constitution or in a statute or regulation which clearly reflects the particular 'public policy' being relied upon." *Carl*, 702 A.2d at 162 (Terry, J., concurring); *see Fingerhut*, 738 A.2d at 803 n. 7, 805–07.

*Carl* thus first requires "a clear mandate of public policy" that is "solidly based on a statute or regulation that reflects the par-

ticular public policy to be applied." 702 A.2d at 164 (Terry, J., concurring). The parties agree that section 501(c)(3) and 20 C.F.R. § 638.814 "express a 'policy against the subsidization of private political activity by the taxpayers.' " HBI Reply at 20 (quoting Pl.'s Opp'n at 27–28). HBI believes that this policy, however, is not the type of "clear mandate of public policy" envisioned by *Carl*. Citing "[the] only four reported District of Columbia cases [that] have recognized new public policy exceptions based on *Carl's* criteria, [*Carl*, 702 A.2d at 163–64, *Wash.*, 718 A.2d at 1080–81 *Fingerhut*, 738 A.2d at 805–07, and *Liberatore*, 168 F.3d at 1331]," HBI contends that recognition of an additional public policy exception under *Carl* requires a policy based upon a law that: (1) proscribes a *criminal* offense; and (2) represents a *compelling* public policy in that it either: (a) imposes a specific legal duty on the plaintiff, (b) promotes and protects the precise activity that the plaintiff engaged in; or (c) protects the public from an identifiable and potentially catastrophic harm. HBI Mot. at 19–20. Here, contends HBI, neither section 501(c)(3) nor 20 C.F.R. § 638.814 meets these criteria, and therefore, the Court should dismiss Riggs's *Carl* claim. *Id.* at 20–28. Riggs counters that the "strong public policy against the subsidization of private political activity by the taxpayers" expressed in section 501(c)(3) and 20 C.F.R. § 638.814 is sufficient for the purposes of *Carl* and that the Court should reject the "irrelevant" factors advanced by HBI. Pl.'s Opp'n at 27–29. For the reasons that follow, the Court agrees.

The Court can find little, if any, support for HBI's first argument that the policy of section 501(c)(3) and 20 C.F.R. § 638.814 is inadequate because neither law proscribes criminal conduct. HBI extrapolates from its observance that *Carl* exceptions have

been found only in cases in which the law at issue proscribed a criminal offense a criterion that only statutes that are penal in nature may qualify for the purposes of *Carl*. But HBI has cited no case actually holding that the recognition of a public policy exception under *Carl* must be firmly anchored to a law that "define[s] or proscribe[s] a *criminal offense*." HBI Mot. at 20 (emphasis in original). Indeed, Judge Terry's concurrence in *Carl*, recognizing the *Constitution* itself as an authority to which recognition of a public policy exception could be firmly anchored, 702 A.2d at 162 (stating that "the recognition of any such exception must be firmly anchored either in the Constitution or in a statute or regulation which clearly reflects the particular 'public policy' being relied upon"), would be rather odd, if not entirely contradictory, if the predicate authority had to be "penal in nature." *Adams*, upon which *Carl* was built, similarly would be rendered an oddity if criminal liability were a dispositive factor, as Judge Terry, writing for the court there, recognized that "the criminal liability facing" the employee who refused to operate a delivery truck because it did not have a current inspection sticker "was not very great," but that the choice his employer compelled him to make was nonetheless "unacceptable and unlawful." 597 A.2d at 34. In fact, the very premise of HBI's argument—that the courts in *Carl, Washington, Fingerhut,* and *Liberatore* recognized public policy exceptions *because* the underlying authorities were criminal in nature—falls apart upon careful inspection of the cases. The court in *Washington*, for example, never even mentioned criminal liability in conjunction with the "health and food regulations" it considered in discerning a cognizable public policy exception, *see* 718 A.2d at 1073 & n. 1, 1080, which is mystifying to the Court if the criminal nature of the pertinent authority is an important, dispositive factor.[12] *See also* Liberatore, 168 F.3d at 1331 (relying on both federal and state law proscribing the improper storage of drugs to identify public policy, yet mentioning criminal liability with respect to only federal law). The Court will therefore decline HBI's invitation to import a requirement that the recognition of a public policy exception under *Carl* must be based upon authority proscribing a criminal offense.

HBI next contends that section 501(c)(3) and 20 C.F.R. § 638.814 are inadequate bases for recognizing a *Carl* exception because neither law imposes a specific legal duty on the plaintiff to oppose or abstain

---

12. Noticeably absent from the court's rationale was any mention of criminal liability under the pertinent regulations:

> The health and food regulations which we have cited in footnote 1, *supra*, are expressions of a clear public policy proscribing, in the interest of public health, the preparation, service or sale of adulterated or contaminated food. Conduct that imperils the health and safety of the elderly residents of a retirement home, who, as a group, are particularly vulnerable to the kind of practice here alleged, is obviously contrary to the public policy of this jurisdiction, and Guest Services has not seriously argued the contrary.

*Washington*, 718 A.2d at 1080. Nor did the court mention criminal liability or quote language to that effect in setting forth the pertinent regulations in footnote 1:

> *See. e.g.,* 23 DCMR § 2101.1 (1990) ("No person shall dispense, . . . prepare, [or] process . . . food unless it be appropriately protected from deleterious aerosol. . . ."); 23 DCMR § 2200.2 (1990) ("No person shall work or be allowed to work in any capacity . . . [w]hen the person does not use hygienic work practices."); 23 DCMR § 3010.1 (1990) ("All food and drink shall be wholesome [and] unadulterated. . . ."); *cf.* D.C.Code § 22–3416 (1996) ("No person shall sell, or cause to be sold, or offer for sale any food which is unwholesome or unfit for use.").

*Id.* at 1073 n. 1.

from political activity, promotes and protects the precise activity that the plaintiff engaged in, or protects the public from an identifiable and potentially catastrophic harm. HBI Mot. at 20, 23–27 (citing *Fingerhut, Carl,* and *Liberatore* and *Washington,* respectively). Riggs counters with a mere truism: not every case that has recognized a *Carl* exception relied upon statutes having all three characteristics proffered by HBI. *See, e.g.,* Pl.'s Opp'n at 31 (stating that "[t]here is absolutely no indication in *Carl,* for example, that the discharged nurse had a duty to testify before the city council or in court as an expert witness, yet she stated a claim for wrongful discharge," despite fact that HBI cites *Fingerhut,* not *Carl,* for the proposition). But Riggs's argument misses the mark, as HBI has proffered these factors in a disjunctive manner. *See* HBI Mot. at 20 ("Moreover, the laws at issue in these cases *either* imposed a specific legal duty on the plaintiff, promoted and protected the precise activity that the plaintiff had engaged in, *or* were intended to protect the public from an identifiable and potentially catastrophic harm.") (emphasis added). Nonetheless, the Court can find no support for the implication underlying HBI's argument: that the three characteristics HBI identifies necessarily represent an exhaustive list of acceptable bases for recognizing a clear mandate of public policy. Neither the D.C. Court of Appeals nor the Court of Appeals for this Circuit have so held. While the Court agrees with HBI that *Fingerhut, Carl, Liberatore,* and *Washington* must be reviewed carefully to distill guiding principles for the recognition of sufficiently clear mandates of public policy, therefore, the Court cannot agree with HBI's implicit contention that the three characteristics that it has extracted from the cases represent the only bases upon which public policy exceptions may be recognized. In any event, as explained below, the Court finds *Liberatore* and *Washington* to be sufficiently analogous to the case at hand to support the recognition of a colorable public policy exception.

In looking to the cited case law for guidance, the Court generally agrees with HBI that *Carl* and *Fingerhut* are, to a degree, distinguishable from the case at hand. *Carl* involved a statute that specifically protected a citizen's right to testify before the District's Council through criminal proscriptions. The court there noted that the "thuggery" anticipated by the statute's criminal provisions (such as slashing the tires of an employee), however, was unlikely, and that the employer's "most effective power to injure an employee" stemmed instead from the employment relationship itself, and specifically, termination of the employment. It was thus not a large step for the court to recognize a public policy exception stemming from the statute for an employee who had been terminated in retaliation for testifying before the Council. *Carl,* 702 A.2d at 165. Here, by contrast, neither section 501(c)(3) nor 20 C.F.R. § 638.814 affirmatively protects individuals in their efforts to refuse to help charitable organizations from engaging in political lobbying. As HBI puts it, neither law promotes or protects the precise activity that the plaintiff engaged in. *Fingerhut* is similarly distinguishable. The court there relied upon several statutory provisions specifically prohibiting bribery and requiring D.C. law enforcement officers to affirmatively act to enforce the laws to recognize a policy "against the termination of a special police officer who records and reports a bribe of a government official, and who assists the FBI in the investigation of corrupt influence with respect to a federal government construction grant." *Fingerhut,* 738 A.2d at 806. The court thus found a close fit between this policy and the employer's

decision not only to terminate the plaintiff after he informed the employer of impending arrests, but also to fill the plaintiff's position even though the stated reason for the termination was a reduction in force. *Id.* at 807. Neither of the laws cited by Plaintiff in this case place an affirmative duty upon the plaintiff that is as highly specific, clearly compelling him to take certain action, as was the case with the pertinent provisions in *Fingerhut.*[13]

However, the Court does not agree with HBI's assessment of *Liberatore* and *Washington* and finds both cases sufficiently analogous to lend support to the plaintiff's claim here. In both cases, the courts relied upon various provisions concerning the proper storage and handling of food and drugs to recognize a policy of protecting the public health. The *Liberatore* court then sustained a cause of action brought by a plaintiff alleging that he had been fired in retaliation for threatening to report violations of various drug storage and handling provisions to the FDA. 168 F.3d at 1331. Similarly in *Washington,* the court sustained an action by a plaintiff who was allegedly discharged for attempting to persuade her fellow worker and her employer not to violate the pertinent contami-

nated food provisions and for protesting such violations. 718 A.2d at 1080. HBI contends that because violations of the laws at issue here "pose[ ] no health or safety risks," the public policy accompanying section 501(c)(3) and 20 C.F.R. § 638.814 are not "compelling" enough. That is, HBI attempts to clarify, the political activity proscriptions at issue in this case were not intended to prevent any "identifiable harm" and "courts have consistently held that the type of harm that results when government resources (including taxpayer funds) are misused is too abstract to create a legal injury of any kind." HBI Mot. at 27 (citing *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *Doremus v. Bd. of Educ.,* 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952)). But the Court finds the line drawn by HBI between the protection of public health and protection of the public treasury to be a distinction without a difference. As a preliminary matter, it may be true that cases have determined that the harm to the public treasury is too abstract to recognize a legal injury for that particular harm. The legal injury claimed here, however, is not injury to the public treasury, but injury stemming from the termination of Plaintiff's employment for

---

**13.** However, Plaintiff correctly notes several provisions related to the laws at issue here that at least indirectly required him, as an officer of HBI, to refuse to engage in less specific political spending practices, as he could have otherwise been penalized through taxes applied to him personally. *See* Pl.'s Opp'n at 25 (citing 26 U.S.C. § 4955(a)(2) ("There is hereby imposed on the agreement of any organization manager to the making of any expenditure, knowing that it is a political expenditure, a tax equal to 2 1/2 percent of the amount thereof, unless such agreement is not willful and is due to reasonable cause. The tax imposed by this paragraph shall be paid by any organization manager who agreed to the making of the expenditure."); *id.* § 4955(b)(2) ("In any case in which an additional tax is imposed by paragraph (1), if

an organization manager refused to agree to part or all of the correction, there is hereby imposed a tax equal to 50 percent of the amount of the political expenditure. The tax imposed by this paragraph shall be paid by any organization manager who refused to agree to part or all of the correction."); *id.* § 6684(2) ("If any person becomes liable for tax under any section of chapter 42 (relating to private foundations and certain other tax-exempt organizations) by reason of any act or failure to act which is not due to reasonable cause and either—(1) such person has theretofore been liable for tax under such chapter, or (2) such act or failure to act is both willful and flagrant, ... then such person shall be liable for a penalty equal to the amount of such tax.")).

attempting to comply with laws specifically designed to protect the public treasury. The cases cited by HBI are thus of little, if any, help. More important, HBI's invitation to the Court to subjectively evaluate what types of policy it finds more "compelling" than others would only add grease to an already extremely slippery slope in this area of law. The Court will thus decline it. Instead, the Court must focus on whether there is a clear mandate of public policy solidly based on statute as required by *Carl* and its progeny. Through this lens, *Liberatore* and *Washington* are sufficiently analogous to the case at hand. As with the policy of protecting public health recognized in those cases, there is a clear mandate of public policy against the subsidization of private political activity by the taxpayers in this case, as recognized by both parties, that is solidly based on section 501(c)(3) and 20 C.F.R. § 638.814. *See* 26 U.S.C. § 501(c)(3); 20 C.F.R. § 638.814; Pl.'s Opp'n at 27–28; HBI Reply at 20; *see also, e.g., Cammarano v. United States,* 358 U.S. 498, 512, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959) (reviewing history of limitations of the congressional policy against an exemption for organizations that attempt to promote or defeat legislation and stating that "[t]hese limitations, carried over into the 1939 and 1954 Codes, made explicit the conclusion derived by Judge Learned Hand in 1930 that 'political agitation as such is outside the statute, however innocent the aim.... Controversies of that sort must be conducted without public subvention; the Treasury stands aside from them' "); *Regan v. Taxation With Representation of Washington,* 461 U.S. 540, 550, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) (noting congressional concern that section 501(c)(3) organizations might use tax-deductible contributions to lobby to promote the private interests of their members); *Haswell v. United States,* 205 Ct.Cl. 421, 500 F.2d 1133, 1140 (1974) ("The limita-

tions in sections 501(c)(3) and 170(c)(2) of the 1954 Code stem from the policy that the United States Treasury should be neutral in political affairs and that substantial activities directed to attempts to influence legislation should not be subsidized."). The Court therefore concludes that the policy of protecting against abuse of the public treasury by utilizing its funds for partisan activity is a sufficiently clear mandate of public policy for the purposes of *Carl.*

*Carl* also requires "a close fit between the policy thus declared and the conduct at issue in the allegedly wrongful termination." 702 A.2d at 164. A majority of the court in *Carl* elaborated that "in determining whether a public policy exception to the at-will doctrine applies," a court "need only decide" whether the firing, because of the plaintiff's conduct, "is sufficiently within the scope of the policy embodied in the statute so that a court may consider imposing liability on [the defendant] for [the plaintiff's] termination for otherwise permissible reasons." 702 A.2d at 165. HBI contends that "it can hardly be said that the meager cost that would have been associated with Plaintiff's attendance at the RNC and the private NAHB meetings would have been so offensive to this policy that it would warrant a new exception under *Carl.*" HBI Reply at 23. Riggs counters by pointing to allegations in his complaint that HBI terminated his employment solely because of his *consistent* refusal to participate in activities prohibited by law and his *repeated* insistence that HBI conform with the applicable laws. He claims that such allegations suffice to show the requisite close fit.

As was true in *Carl,* this question is "not an easy one to answer." 702 A.2d at 165. There, the court determined that the termination of the plaintiff's employment for testifying before the D.C. Council and in

court was sufficiently tied to the identified policy of promoting and protecting every citizen's right to testify before the legislature found in section 1–224. *Carl,* 702 A.2d at 165. Analogously here, for the current purposes of deciding whether dismissal is warranted under Rule 12(b)(6), the fit is close enough to permit Riggs to proceed. Despite HBI's contention that the alleged violations are too trivial to qualify, the Court notes that the triviality of such averments is a question of fact that the Court simply cannot evaluate at this stage in looking at allegations in a complaint rather than a developed factual record. It finds that Riggs's alleged termination solely for his consistent refusal to participate in activities prohibited by law and repeated insistence that HBI conform with the applicable laws falls within the policy of prohibiting tax-exempt organizations and DOL-fund recipients from using public funds for political lobbying purposes. Given the intent in section 501(c)(3) and 20 C.F.R. § 638.814 to prohibit lobbying and other specified political activities by tax-exempt organizations, Riggs should receive the opportunity to prove his injury stemming from HBI's termination of his employment as the organization's president solely because he would not engage in such lobbying and partisan political activities.

### *(iii) Civil Conspiracy*

HBI finally argues that "[b]ecause Plaintiff's wrongful discharge allegations fail to state [a] claim upon which relief can be granted, Plaintiff's civil conspiracy claim must be dismissed for lack of an underlying tort." HBI Mot. at 28; HBI Reply at 24. Given the Court's holdings above, however, the premise for HBI's argument has been vitiated. Accordingly, the Court must reject HBI's argument.

### 2. Tortious Interference, Civil Conspiracy, and Defendants NAHB, Downs, and Mitchell

Defendants NAHB, Downs, and Mitchell contend that Riggs's at-will status precludes his claims for tortious interference with contract and prospective advantage, and they assert that the civil conspiracy claim fails for the lack of an underlying tort to support the claim. They add that as a trustee of HBI, Downs cannot be held personally liable for tortious interference or civil conspiracy because he acted within the scope of his duties and not to the detriment of the organization.

### (a) Tortious Interference with Contract

■ The D.C. Court of Appeals has explained that four elements comprise the tort of intentional interference with contractual relations: " '(1) existence of a contract, (2) knowledge of the contract, (3) intentional procurement of its breach by the defendant, and (4) damages resulting from the breach.' " *Sorrells v. Garfinckel's,* 565 A.2d 285, 289 (D.C.1989) (quoting *Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan,* 374 A.2d 284, 288 (D.C.1977)). NAHB contends that Riggs's claim fails because there was no wrongful Termination and because Riggs's status as an at-will employee precludes relief. For the reasons stated above in denying HBI's motion to dismiss Riggs's wrongful discharge claim, NAHB's former contention is baseless. It's latter argument, however, is supported by recent case law, and the Court consequently will dismiss this claim.

Applicable case precedent bars Riggs's intentional interference with contract claim here. In a recent case, the D.C. Court of Appeals stated that "[i]t is clear that, as an at-will employee, [the plaintiff] did not have a contractual employment relationship she could use as the basis for a suit

for tortuous [sic] interference with a contractual relationship." *McManus v. MCI Communications Corp.*, 748 A.2d 949, 957 (D.C.2000) (citing *Bible Way Church v. Beards*, 680 A.2d 419, 432–33 (D.C.1996) (affirming trial court dismissal when plaintiff failed to rebut at-will employment presumption, thus leaving "no basis for either a breach of contract or a tortious interference with contract claim"; the complaint indicated nothing about an "employment contract with [the defendant]—a necessary prerequisite for breach of contract and tortious interference with contract claims")). Riggs attempts to distinguish *McManus* and *Bible Way* by arguing that the court in those cases "focused" on the plaintiffs' failure to state claims for wrongful discharge. Pl.'s Opp'n at 21–22. While it may be true that the plaintiffs in both cases did, in fact, fail to state wrongful discharge claims, neither court "focused" on such failures as *the* reason for dismissing the tortious interference claims. To the contrary, the courts in both cases addressed the wrongful discharge and tortious interference issues separately, and specifically focused on the plaintiffs' at-will status in rejecting the tortious interference claims. *See McManus*, 748 A.2d at 957–58; *Bible Way*, 680 A.2d at 432–33. This court thus explained after *Bible Way*:

> Thus, in the *Bible Way* case, the highest court of the District of Columbia decided authoritatively that under an at-will arrangement the prerequisite does not ex-

ist for the tort of interference with employment relationship. A third party who interferes with such a tenuous relationship is not liable to the employee since no wrongful breach of contract can result from his interference. To put it another way, if there is no fixed or assured employment there is nothing tangible with which to interfere.

*Dale v. Thomason*, 962 F.Supp. 181, 184 (D.D.C.1997) (Greene, H., J.). Riggs argues that the court was incorrect in *Dale*. Pl.s Opp'n at 22. But the *McManus* court, in citing *Bible Way* and stating that "[i]t is clear that, as an at-will employee, [the plaintiff] did not have a contractual employment relationship she could use as the basis for a suit for tortuous [sic] interference with a contractual relationship," closed the door on Riggs's theory. 748 A.2d at 957.[14] Riggs also cites *Sorrells*, 565 A.2d at 290, for support. In that case, decided long before *Bible Way* and *McManus*, the plaintiff was an at-will employee who sued her supervisor for tortious interference with contract. The supervisor-defendant claims that she could not be held liable because as an agent of the employer, she was not a third party to the contractual relationship between the employer and the plaintiff, so that she could not tortiously interfere with that relationship. The court rejected the supervisor's argument, holding that "a person who maliciously procures the discharge of another by their common employer is not shielded

---

**14.** In reiterating the language from the D.C. Court of Appeals in *McManus* and construing that case, along with *Bible Way*, to foreclose the plaintiff's argument here, however, the Court is not saying that at-will employment is not contractual in nature. The Court has no reason to disagree with prior statements from this court to the effect that "[i]t is well settled that the District of Columbia views at-will employment as a species of contract." *Sheppard v. Dickstein, Shapiro, Morin & Oshinsky*, 59 F.Supp.2d 27, 32 (D.D.C.1999) (Lamberth,

J.) (citing *Rinck v. Ass'n of Reserve City Bankers*, 676 A.2d 12, 15 (D.C.App.1996); *Minihan v. Am. Pharm. Ass'n*, 812 F.2d 726, 727 (D.C.Cir.1987); *Carl v. Children's Hosp.*, 702 A.2d 159, 162 (D.C.App.1997)). Rather, the Court is merely abiding by the plain language of *McManus* and *Bible Way*, each stating that at-will employment is *an insufficient basis for the type of contractual relationship necessary* to serve as a basis for the intentional tort of interference with contract.

from liability [for tortious interference] by his or her status as a supervisory employee." *Sorrells*, 565 A.2d at 289–91. Riggs makes an interesting point about the fact that the plaintiff there was an at-will employee. But as this court explained in *Dale* in rejecting a similar argument, "*Sorrells* involved only the question whether a supervisory employee may interfere with a subordinate's employment without a proper purpose. The court did not consider the issue whether an at-will employee may maintain such an action at all." 962 F.Supp. at 183. Thus *Sorrells*, which simply did not address the issue, does not provide sufficient support for the plaintiff's claim. In light of the plain language of *McManus*, *Bible Way*, and *Dale*, the Court concludes that Riggs's claim for tortious interference with contract must be dismissed.

### (b) Tortious Interference with Prospective Advantage

 The D.C. Court of Appeals "has described 'prospective advantage,' in defining the tort of interference with prospective advantage, as 'business expectancies, not grounded on present contractual relationships but which are commercially reasonable to anticipate, [and] are considered to be property.'" *McManus*, 748 A.2d at 957 (quoting *Carr v. Brown*, 395 A.2d 79 (D.C.1978)). This intentional tort also has four elements: "(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach of termination of the relationship or expectancy, and (4) resultant damage." *Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 499 (D.C.Cir.1995) (citing *Genetic Sys. Corp. v. Abbott Labs.*, 691 F.Supp. 407, 422–23 (D.D.C.1988); *Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan*, 374 A.2d 284 (D.C.App.1977)).

NAHB attacks Riggs's tortious interference with prospective advantage claim by again citing *McManus*. Riggs counters by citing three older federal district court cases that he claims exemplifies the proposition that "[c]ourts in the District of Columbia have consistently recognized a claim for tortious interference with employment rights, even where the plaintiff is an at-will employee." Pl.'s Opp'n at 16 (citing *Ellis v. Time, Inc.*, No. 94–1755, 1997 WL 863267, at *16 (D.D.C. Nov.18, 1997) (Johnson, J.); *Bell v. Ivory*, 966 F.Supp. 23, 31 (D.D.C.1997) (Sporkin, J.); *Rauh v. Coyne*, 744 F.Supp. 1186, 1190 (D.D.C.1990) (Greene, H., J.)).

The D.C. Court of Appeals in *McManus* did not just stop after citing *Bible Way* and stating that "[i]t is clear that, as an at-will employee, [the plaintiff] did not have a contractual employment relationship she could use as the basis for a suit for tortuous [sic] interference with a contractual relationship." 748 A.2d at 957. It went on to reject the plaintiff's similar argument there that her claim was nonetheless available because "she had a long-term employment relationship and an expectancy of continuing employment relations with MCI." *Id.* In so doing, the court explained that it "never has held that an employee can maintain a suit for interference *with prospective advantage* where her expectancy was based on an at-will relationship, and we do not do so now." *Id.* (emphasis added). Rather than addressing *McManus*, Riggs presses the Court to join him in ignoring such recent binding precedent and to recognize his claim based on examples such as *Ellis*, *Bell*, and *Rauh*. In *Ellis*, this court cited *Bell* and *Rauh* for the proposition that "[c]ourts in the District of Columbia have recognized a claim for tortious interference with employment rights where the plaintiff was an at-will employee, *albeit obliquely*." 1997 WL

863267, at *17 (emphasis added). In addition to the caveat respecting this "oblique" recognition, the court further qualified its finding with the fact that "[o]ther than *Dale*, the parties ha[d] pointed to no case, and the Court [could] find none, that, applying D.C. law, denies an at-will employee the ability to proceed with a tortious interference with business relations claim." *Id.* But the D.C. Court of Appeals in *McManus* has clarified any confusion concerning D.C. case law on this issue, and thus has effectively repealed any "oblique" recognition to the contrary. The Court thus concludes that Riggs's claim for tortious interference with prospective advantage, too, must be dismissed under the plain language of *McManus*.

### (c) Civil Conspiracy

 The tort of civil conspiracy has four elements: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner, and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme." *Griva v. Davison*, 637 A.2d 830, 848 (D.C.1994) (citing *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C.Cir.1983)). Moreover, "civil conspiracy depends on the performance of some underlying tortious act. It is thus not an independent action; it is, rather, a means for establishing vicarious liability for the underlying tort." *Id.* Riggs alleges in his complaint that "each and every one of the defendants combined together, agreed and conspired with one another to terminate Mr. Riggs' employment as HBI's president because of his refusal to advance NAHB's political and legislative agenda through means prohibited by federal tax laws and DOL regulations." Compl. ¶ 25. He further alleges that the defendants "committed overt unlawful acts in furtherance of the conspiracy … including but not limited to HBI's wrongfully and tortiously terminating Mr. Riggs' employment" and that such conspiratorial acts "directly and proximately caused plaintiff to suffer" various injuries. *Id.* ¶¶ 57–58.

NAHB argues that Riggs's civil conspiracy claim must be dismissed for two reasons. First, it claims, Riggs has not pled a cognizable underlying tort. For the reasons stated in the Courts denial of HBI's motion to dismiss above, however, this argument fails. Second, NAHB contends that Riggs's general averments, sketched above, are insufficient to sustain his civil conspiracy claim. In other words, Riggs has made general averments "without relying on a single demonstrative fact for support." NAHB Reply at 8. NAHB complains, for example, that Riggs's complaint is "devoid of any facts that specifically support the vital element of a meeting of the minds," and "has also not adequately alleged that one of the parties to the agreement performed an unlawful over act that caused his injury." *Id.* However, the Court can find no fatal fault with Riggs's allegations for the purposes of Rule 12(b)(6). NAHB is essentially asking the Court to impose a heightened pleading regime on Riggs, which it may not do for the reasons discussed at length above with respect to the Rule 8 pleading standards. To summarily reiterate, "[u]nder the Federal Rules, the purpose of pleading is simply to 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests,' not to state in detail the facts underlying a complaint." *Atchinson v. District of Columbia*, 73 F.3d 418, 421 (D.C.Cir.1996) (citing *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see Sinclair v. Kleindienst* 711 F.2d 291, 293 (D.C.Cir.1983)). For the current purposes of Rule 12(b)(6), Riggs's complaint "need not allege all that [he] must eventually prove," *Atchinson*, 73 F.3d at 422. Dismissal is warranted only

if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S. at 45–46, 78 S.Ct. 99. The Court is not convinced at this stage of the litigation that Riggs is incapable of proving facts in support of his civil conspiracy claim that will entitle him to relief and will not, therefore, dismiss his claim.

### (d) Downs's Personal Liability

■ Defendant Downs argues that as a trustee of HBI, he cannot be held personally liable for civil conspiracy.[15] For support, he points to his privilege as a corporate officer to interfere with the corporation's contracts with others. *Nickens v. Labor Agency of Metro. Washington*, 600 A.2d 813, 820 (D.C.1991). The privilege on which he relies, however, is qualified:

> A corporate officer's improper interference with contractual relations of a corporate employee with actual malice or for his own benefit, rather than for the corporation's interest, deserves no protection. In that case, the officer should be viewed as acting in his individual capacity and interest rather than on behalf of the corporation.... While a corporate officer is privileged to interfere with the corporation's contracts with others so long as he or she acts in good faith and in the corporation's interests, the officer will be personally liable if he acts against the corporation's interest, for his own pecuniary benefit, or with the intent to harm the plaintiff.

*Id.* (citing *Phillips v. Montana Educ. Ass'n*, 187 Mont. 419, 425, 610 P.2d 154, 158 (1980)); *accord, e.g., Curaflex Health Servs., Inc. v. Bruni*, 899 F.Supp. 689, 695 (D.D.C.1995) ("If a corporate officer's contractual interference is for an illegal or improper purpose, or outside the scope of the officer's authority, however, then the privilege is vitiated and the individual officer may be held personally liable.").

Riggs contends that Downs does not qualify for the privilege because his actions were beyond the scope of his authority. For support, he points to allegations in his complaint to the effect that Downs intentionally induced HBI and conspired with the other defendants to terminate his employment with HBI. *See* Compl. ¶¶ 24–25, 27–30, 48–54, 55–58. In so doing, Riggs asserts, Downs acted not as an agent of HBI, but as an agent of NAHB (as its Executive Vice President and Chief Executive Officer at NAHB meetings and activities), advancing its legislative agenda without regard to HBI's tax-exempt status and receipt of DOL funds. Riggs also argues that Downs acted with malice, pointing to allegations in his complaint that Downs intentionally, maliciously, and tortiously interfered with his business relationship with HBI and did so as the improper consequence of Riggs's unwillingness to participate in political activities. Compl. ¶¶ 48–54. Finally, Riggs claims that Downs's actions were adverse to the interests of HBI because "he subjected the organiza-

15. Downs makes the same argument with respect to the tortious interference claims against him. Because the Court will dismiss those claims, however, it need not address Downs's personal liability with respect to them. In addition, Defendant Mitchell originally joined Downs's arguments against personal liability for the claims in this lawsuit on the basis that Riggs's initially alleged that Mitchell, as well as Downs, was a trustee of HBI. However, Riggs subsequently moved with consent for leave to amend his complaint, which the Court granted, to reflect the fact that Mitchell actually was not a trustee during the relevant time period. *See supra* note 2; Compl. ¶ 32; Pl.'s Opp'n at 27. Defendants consequently retracted their arguments respecting Mitchell's personal liability for the current purposes. *Compare* NAHB Mot. at 8–11, *with* NAHB Reply at 9–13 & n. 9.

tion to possible civil penalties, loss of its tax exempt status and the imposition of excise taxes, and the loss of DOL grant moneys." Pl.'s Opp'n at 30. Downs counters by opining that all of his actions fall within the scope of his authority and duties as an HBI trustee. He further claims that because the entire Board of Trustees of HBI made the decision to terminate Riggs's employment, Riggs's allegations against him alone are baseless. Finally, he adds that there are "no specific allegations that support a claim" that he acted maliciously. NAHB Reply at 11.

The Court finds Riggs's allegations sufficient to survive Downs's Rule 12(b)(6) attack. As discussed in the preceding section, NAHB and Downs confuse the standard to applied at this stage of the pleadings. Riggs need not allege every specific fact necessary to ultimately sustain his claim. Despite this standard, NAHB and Downs nonetheless assert their conclusory opinion that Downs's actions fall within his scope of his duties as trustee of HBI and that Riggs has not alleged malice with sufficient specificity.[16] Whether NAHB's opinions will ultimately carry the day and whether Riggs will be able to substantiate his allegations remains to be seen. But it is not for the Court at this stage to make such determinations. Instead, Riggs's complaint only needs to aver that Downs's actions qualify for an exception to the corporate privilege Downs claims, and he has down so adequately. The Court will not, therefore, dismiss the claim against Downs for civil conspiracy.

### III. CONCLUSION

For the foregoing reasons, the Court will deny HBI's motion to dismiss, and it will grant in part and deny in part NAHB's motion. Specifically, the Court will dismiss Plaintiff's tortious interference claims against NAHB, Downs, and Mitchell. An appropriate order will accompany this Memorandum Opinion.

### ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that Defendant HBI's motion to dismiss [# 7] is **DENIED.** It is further

**ORDERED** that Defendant NAHB, Downs, and Mitchell's motion to dismiss [# 8] is **GRANTED IN PART** and **DENIED IN PART.** Specifically, Riggs's tortious interference claims against the defendants are **DISMISSED.**

**SO ORDERED.**

---

**16.** Interestingly, the D.C. Court of Appeals in *Nickens,* a lead case respecting officer liability in the District of Columbia cited by both parties, stated that "[w]hether the corporate officer acted with malice or for an improper purpose is a factual question," and it reversed the trial court's grant of summary judgment because material issues of disputed fact had been raised on this issue. 600 A.2d at 820. Defendants nonetheless ask the Court to grant dismissal, at an even earlier stage of litigation.